[Crim. No. 31738. Second Dist., Div. Two. Aug. 4, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
EMERY SOWELLS RIDDLE, Defendant and Appellant.

564

566

---

**COUNSEL**

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FLEMING, J.—Conviction for first degree murder and related offenses. Defendant's principal claim of error is receipt in evidence of his admissions and confessions.

I

We set out the significant facts in the order in which they unfolded:

*December 2, 1976, 8:45 p.m. (Arcadia).* Robert Kane, an attorney practicing in Los Angeles, returned to his house adjacent to the mountain area of Arcadia to find the premises in moderate disarray, two television sets, stereo components, a box of coins, and camera equipment missing, and his wife of 15 months, Renee Kane, who was 6 months pregnant, also missing. Her automobile was parked in the garage.

Kane notified the police who, after interviewing neighbors, identified defendant Riddle, a painter's helper who had worked painting the Kane house in October, as a possible material witness who had been seen in the area earlier in the day.

Within a few hours Riddle's automobile was located on the street in Pasadena. The police staked it out.

*December 3, 3:40 a.m. (Pasadena).* Riddle returned to his automobile, saw the police, and took off. A high-speed chase ensued, which ended when Riddle crashed his auto into a fence and onto the shoulder of an adjoining freeway, fled on foot with a rifle, and thereafter surrendered to the police. In his automobile the police found a Kane television set, the stereo components, the box of coins, the camera equipment, a pearl ring belonging to Mrs. Kane, and Mrs. Kane's purse with credit cards, house key, and automobile keys. In Riddle's pocket was Mrs. Kane's wrist watch. At the scene of the arrest Lieutenant Ostler of the Arcadia Police Department twice asked Riddle to tell him where the girl was but received no reply.

*December 3, 5:05 a.m. (Arcadia Methodist Hospital).* Riddle, having been taken to the hospital and found not seriously injured, was questioned by Lieutenant Ostler at the hospital in the presence of a doctor and two nurses. A tape recording of the interrogation shows that Riddle was given the full *Miranda* warnings at the outset of the interview

and then asked where Renee Kane was. In one form or another Ostler asked this same question seven times. He also told Riddle he was going to be charged with felony murder, which meant the possibility of the death penalty, that he better start thinking about avoiding a murder charge and answer, because Renee Kane might still be alive—"Even if you hurt her she may still be alive . . . . Lots of times people are left for dead and they're not dead." To Ostler's interrogation, which lasted six minutes, Riddle made no reply.

*December 3, 8 a.m. (Arcadia Police Station).* Riddle, having been transported to the Arcadia jail, was interviewed in jail some three hours later by Sergeant Morck of the Los Angeles Police Department. The search for Mrs. Kane had produced no other leads. In this interview Sergeant Morck asked two questions and received two answers: What did you do with the blond lady? Rolled her down the mountainside, Riddle replied. Where? In the mountains in the Santa Anita Canyon area. Morck testified the purpose of his questions was to find Mrs. Kane while still alive. He did not give the *Miranda* warnings because he felt that urgency of time required immediate discovery of Mrs. Kane if she had been left somewhere in the nearby mountains. Morck's interview lasted two to three minutes.

*December 3, 12 noon (County Hospital, Jail Ward).* Sergeant Morck again interviewed Riddle, this time at Los Angeles County Hospital, where Riddle had been taken for anxiety reaction. First, Morck gave him the *Miranda* warnings, and then asked Riddle to show him the exact location where the woman was. Riddle said he would be willing to do this. An extensive automobile trip up and down Santa Anita Canyon produced no results. On the way back Riddle said he thought he had killed her and related some of the evidence of the crime: he had gone to the Kane house to take some items of value, he had been surprised by Mrs. Kane, he had hit her on the head with a rifle barrel, taken the items he wanted, and put Mrs. Kane in the trunk of his automobile.

*December 4, 1:30 p.m. (County Hospital, Jail Ward).* By this time 100 persons were searching the mountains for Mrs. Kane. Sergeant Morck interviewed Riddle for the third time and again gave him the *Miranda* warnings. Morck told Riddle he had been trying without success to find Mrs. Kane and that knowledge of the entire happening might help. Riddle repeated his account of hitting Renee Kane over the head with a rifle barrel in the course of burglarizing her premises, putting her body in his auto trunk, and then dumping it in Santa Anita Canyon.

*December 4, 4 p.m. (Brookside Park, Pasadena).* Renee Kane's naked body was found in an isolated area of Brookside Park west of Pasadena, some 10 miles from the Santa Anita Canyon area in Arcadia. Tape had been placed over her mouth and wrists, and she had been strangled to death with an electric cord.

*December 5, 2 p.m. (County Hospital, Jail Ward).* Sergeant Morck interviewed Riddle for the fourth time. Once more he delivered the *Miranda* warnings, and once more Riddle confessed the killing. Riddle said his earlier statements about the location of the body had been false because he had not wanted to involve his parents and girl friend, who lived in the Pasadena area near Brookside Park.

Defendant's motion to suppress evidence of his admissions and confessions was denied, and, after a jury trial, he was found guilty of first degree murder, first degree burglary, and first degree robbery, the burglary and robbery being accompanied by use of a firearm. The charge of having been previously convicted of robbery was found true.

## II

The only substantial issues on appeal arise from the receipt in evidence of defendant's admissions and confessions, whose use defendant attacks for involuntariness, and for lack of compliance with the warnings required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

These issues involve five interrogations:

1. The December 3, 5:05 a.m. interrogation at Arcadia Methodist Hospital by Lieutenant Ostler (identified as O);

2. The December 3, 8 a.m. conversation at Arcadia Police Station with Sergeant Morck (identified as M-1);

3. The December 3, 12 noon conversation with Sergeant Morck at County Hospital Jail Ward (identified as M-2);

4. The December 4, 1:30 p.m. conversation with Sergeant Morck at County Hospital (identified as M-3);

5. The December 5, 2 p.m. conversation with Sergeant Morck at County Hospital after the victim's body had been found (identified as M-4).

### M-2, M-3, and M-4 Conversations

Conversations M-2, M-3, and M-4 require no extended discussion because the trial court found on strong evidence that each of them had been voluntary, and that prior to each of them full *Miranda* warnings had been given. Hence, the confessions given in these three conversations are, considered by themselves, fully valid and admissible in evidence. Nevertheless, the validity of the confessions during M-2, M-3, and M-4 cannot be considered in a vacuum but must be further evaluated in the light of earlier admissions made during M-1, the 8 a.m. conversation on December 3 in which Riddle said he had rolled the blond lady down the mountainside in the Santa Anita Canyon area. At M-1 Riddle first admitted knowledge of the whereabouts of the missing person and some connection with her disappearance, admissions which clearly implied involvement in her kidnaping and in injury to her person. In accordance with the adage that once the cat is out of the bag it can never be put back in (*United States* v. *Bayer* (1947) 331 U.S. 532, 540 [91 L.Ed. 1654, 1660, 67 S.Ct. 1394]), a later valid confession may be vitiated by an earlier invalid confession. (*Harrison* v. *United States* (1968) 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008]; *People* v. *Spencer* (1967) 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715].) Even though the information Riddle gave during M-1 proved false in detail, he did admit knowledge of and connection with Mrs. Kane's disappearance. The key inquiry, therefore, is whether it was proper for Sergeant Morck to ask Riddle the two questions he did in M-1 without first delivering the *Miranda* warnings, and the key issue is whether the trial court correctly refused to suppress Riddle's admissions during M-1 and his subsequent confessions during M-2, M-3, and M-4. The issue subdivides into a factual and a legal question.

### M-1 Conversation

█ The factual question is whether Riddle's admissions during M-1 were voluntary or were coerced. Only two questions were asked. No physical force was used. The entire interview lasted no more than two to three minutes. The trial court reviewed these facts, heard the witnesses, including Riddle, and determined that the interview had been conducted in an attempt to rescue the kidnaped victim, had been designed for that

purpose, and had not been tainted by coercion or intimidation. The trial court found the admissions had been freely and voluntarily made and denied Riddle's motion to suppress them. We agree with the trial court's finding of voluntariness and with its conclusion that the evidence was factually admissible.

■ The legal question is whether the warnings required by the court's opinion in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], should have been given to Riddle at M-1, and whether the absence of these warnings not only made inadmissible his answers to the two specific questions but tainted his three subsequent confessions, even his testimony at the trial, and made them all inadmissible. (*Harrison* v. *United States* (1968) 392 U.S. 219, 222-224 [20 L.Ed.2d 1047, 1051-1053, S.Ct. 2008].) The opinion in *Miranda* declares that once suspicion of crime has focused on a suspect and he has been taken into custody, prior to interrogation he must be advised he has a right to remain silent, anything he says may be used in evidence against him, he has a right to consult an attorney, and if he cannot afford an attorney he will be provided one at no cost. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 444-445, 479 [16 L.Ed.2d 694, 706-707, 726, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Lack of compliance with these rules requires automatic suppression of all evidence obtained as a result of violation of the rules. The *Miranda* opinion is silent on possible exceptions and deviations from its requirements, and it does not discuss the effect that emergency circumstances may have on the rules it has laid down as "new law and new public policy."[1]

At the time of M-1, Riddle was both suspected of crime (theft, burglary, and kidnaping) and held in custody. Under a literal and mechanical reading of *Miranda,* any answers to questions put to Riddle by the police became inadmissible evidence because of the questioner's failure to deliver the *Miranda* warnings prior to his questions. ■ Yet both statutes and court opinions must be construed in the light of their surroundings and purposes, and meaning given them consonant with other principles of law and other aspects of public policy. (*Holy Trinity Church* v. *United States* (1892) 143 U.S. 457, 459-462 [36 L.Ed. 226, 228-229, 12 S.Ct. 511]; *Lynch* v. *Overholser* (1962) 369 U.S. 705, 710 [8

---

[1]"[T]he Court has not discovered or found the law in making today's decision, nor has it derived it from some irrefutable sources; what it has done is to make *new law and new public policy* in much the same way that it has in the course of interpreting other great clauses of the Constitution." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 531 [16 L.Ed.2d 694, 756, 86 S.Ct. 1602, 10 A.L.R.3d 974], White, J. dis; italics added.)

L.Ed.2d 211, 215, 82 S.Ct. 1063].) Neither contracts nor court opinions are to be interpreted mechanically and literally but due attention must be paid to what is implied within them and to the factual situations to which they are addressed. (*Buckley* v. *United States* (1873) 86 U.S. (19 Wall.) 37, 40 [22 L.Ed. 62, 63]; *Markham* v. *Cabell* (1945) 326 U.S. 404, 409 [90 L.Ed. 165, 168, 66 S.Ct. 193].)

Before reaching the conclusion that *Miranda* v. *Arizona* applies without exception to every instance of custodial interrogation and that failure to deliver its warnings always requires exclusion from evidence of answers to questions, we examine another principle—that of overriding necessity or emergency circumstances (usually described in law as exigent circumstances) which may excuse compliance with normal procedures. Emergencies arise when human life or human safety is at stake and time does not permit the employment of normal procedures. As the Supreme Court recently said in *Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408], " 'The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent exigency or emergency.' " (Stewart, J. quoting an earlier appellate court opinion of Burger, J., in *Wayne* v. *United States* (D.C.Cir 1963) 318 F.2d 205, 212.) The most pressing emergency of all is rescue of human life when time is of the essence. An apt example of exigent circumstances appears in *People* v. *Modesto* (1965) 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], where Modesto was arrested on suspicion of murdering one little girl, whose body had been found, and injuring another, who was missing. The court ruled that the possibility of finding the missing girl alive allowed custodial interrogation which did not comply with the usual rules. We discuss *Modesto* in more detail later but mention it now as an example of exigent circumstances which may excuse compliance with normal procedures.

Application of the principle of exigent circumstances is not restricted to situations where human life is at stake. When emergency circumstances exist, formal, legal, and constitutional requirements, such as the need for a warrant to arrest, for a warrant to search, for a warrant to break into premises, for a demand before forcing entry, for a warrant to seize evidence, each may be excused because of overriding necessity. (See, *Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642] (warrantless entry into house by police in hot pursuit of fleeing suspect); *Ker* v. *California* (1963) 374 U.S. 23, 39-40 [10 L.Ed.2d

726, 741-742, 83 S.Ct. 1623] (warrantless and unannounced entry into dwelling by police to prevent imminent destruction of evidence); *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942], (warrantless entry to extinguish fire and investigate for arson); *Wayne* v. *United States* (D.C.Cir. 1963) 318 F.2d 205, 211-212 (forcible warrantless entry into apartment to save human life); *People* v. *Hill* (1974) 12 Cal.3d 731, 753-757 [117 Cal.Rptr. 393, 528 P.2d 1] (warrantless entry into residence where victim had been murdered two hours earlier); *People* v. *Sirhan* (1972) 7 Cal.3d 710, 735-740 [102 Cal.Rptr. 385, 497 P.2d 1121] (warrantless search and seizure of evidence 11 hours after assassination of Senator Kennedy where reasonable belief existed of a conspiracy to assassinate political candidates).) The principle of exigent circumstances, although relatively rare in application, is firmly established in law. In view of the strength of this well-established principle, we reexamine *Miranda* to determine whether its rules of procedure are intended to be absolute rules admitting of no exception or whether the rules may reasonably accommodate the limited number of exceptions that arise from urgent need to save human life.

A review of the *Miranda* opinion brings into focus two points relevant to the present inquiry. First, the factual situation presented in *Miranda* and discussed by the court was that of ongoing criminal investigation, whose purpose and motive is to identify those responsible for a known and completed crime and obtain evidence to prove that responsibility by prosecution in court. That such was the situation addressed by the *Miranda* court is seen most strikingly in its formal requirement that before a person in custody may be interrogated he must be advised not only of his right to consult a lawyer, but of his right to the services of a free lawyer if he cannot pay for one of his own. Such a requirement visualizes the possible lapse of considerable time before any police interrogation of a person in custody who has demanded the services of a free lawyer can take place. Since the court itself observed it was not requiring that a lawyer be on call in every police station around the clock (384 U.S. at p. 474 [16 L.Ed.2d at p. 724]), the requirement necessarily assumes the possibility of substantial delay—hours at a minimum; days, perhaps, over weekends and holidays—before *Miranda's* rules can be met and interrogation go forward, periods of time comparable to those delineating permissible delay in arraignment. In this respect the court's rules for custodial interrogation do not take into account the possibility of emergency circumstances or consider the

possibility of interrogation for purposes not primarily geared to criminal prosecution. Second, the grand design of the *Miranda* court was to discourage police misconduct identified under the label of third degree —police interrogations which make use of physical violence, physical exhaustion, prolonged interrogation, deceptive stratagems, and the like—and by the creation of new legal rules to inhibit and wipe out police inquisitions falling below civilized standards of law enforcement. Through rigidity of procedural rule the court sought to outlaw police misconduct toward persons in custody suspected of crime. To establish this rigidity the court abandoned as too difficult of application its earlier rule, which vitiated a confession only when the totality of circumstances established that illegal police conduct had impelled the confession (e.g. *Haynes* v. *Washington* (1963) 373 U.S. 503, 513-515 [10 L.Ed.2d 513, 520-521, 83 S.Ct. 1336]), and substituted in its place new fixed requirements, any departure from which would trigger the assumption that police misconduct had brought about the proffered confession and automatically exclude it from evidence. (384 U.S. at pp. 458, 466, 467-469, 475 [16 L.Ed.2d 714, 718-721].)

In sum, the two basics of the *Miranda* opinion relevant here are (1) its assumption that the purpose of custodial interrogation is to further criminal prosecution, and (2) its public policy to outlaw police misconduct relating to the third degree. Neither point is central to the question of police conduct in emergencies, where the primary objective of police action is to save human life. The principle of exigent circumstances was not before the *Miranda* court, and the court found no need to discuss its problems. ▮▮ Because the issue remains open, we construe the *Miranda* opinion as not foreclosing recognition of a limited exception to its rules of custodial interrogation in order to meet emergencies affecting human life. We conclude, therefore, that exigent circumstances may excuse compliance with the *Miranda* rules in instances of overriding need to save human life or to rescue persons whose lives are in danger.

What is the scope of this exception, and what elements make up a valid instance of exigent circumstances? The essentials may be seen in *People* v. *Modesto* (1965) 62 Cal.2d 436 [42 Cal.Rptr. 17, 398 P.2d 753], the leading California case involving exigent circumstances and rescue, whose facts and urgency closely parallel those at bench. Modesto was arrested at 2:30 a.m. on suspicion of murdering a nine-year-old girl, whose body had been found, and of having injured a twelve-year-old girl named Connie, who had been missing from home since midnight. Modesto's interrogation started at 6 a.m. About 7:30 a.m. his questioners suggested the little

girl might still be alive. He then directed them to a particular storm drain and told them Connie had fallen in the water. At the scene the officers found nothing, but shortly thereafter they learned the little girl's body had been discovered some distance away. In holding admissible the statements made by Modesto before the discovery of Connie's body, the court said: "They were freely and voluntarily made at a time when the officers were concerned primarily with the possibility of saving Connie's life. *The paramount interest in saving her life, if possible, clearly justified the officers in not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel.* Since these statements were voluntarily made and lawfully obtained, there is no basis for their exclusion. (See *People* v. *Roberts,* 47 Cal.2d 374, 379 [303 P.2d 721].) It is true that in *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], the United States Supreme Court held that incriminating statements surreptitiously obtained from an indicted defendant who had been released on bail could not be used against him at his trial even though the court assumed the statements were lawfully obtained in the course of a continuing police investigation of crime. In the *Massiah* case, however, no compelling emergency was present, and the continuing investigation of other crimes could reasonably be segregated from the proof of the crime for which the defendant had been indicted. *In the present case the officers' investigatory and rescue operations were necessarily inextricably interwoven until Connie's body was found,* and it would be needlessly restrictive to exclude any evidence lawfully obtained during the rescue operations. Under these circumstances we do not believe that the *Massiah* case is controlling." (Pp. 446-447; italics added.)

*Modesto* was followed in *People* v. *Dean* (1974) 39 Cal.App.3d 875 [114 Cal.Rptr. 555], where the court held that the *Modesto* rescue doctrine, although articulated prior to *Miranda,* remained good law and had not been overruled. In *Dean,* likewise a kidnaping case, the defendant had been arrested at the point of a shotgun at a ransom pickup location, handcuffed, and immediately asked where the victim was. His answers were held admissible, the court concluding: "It is difficult to perceive *Miranda* . . . attaching all the formalities to questions concerning the whereabouts and health of a kidnaping victim. *While life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent.*" (P. 882; italics added.) The motivation for the questioning had been to rescue the victim: "Looking to the totality of the facts before us, it is clear the evils *Miranda* sought to alleviate are not involved. The questioning was spontaneous upon apprehending defen-

dant and the sole motivation to rescue the victim. The answers were not obtained through coercion and not sought for the purpose of obtaining a confession—they were free and voluntary. The rescue of the victim was of paramount importance and the rule formulated in *Modesto* remains a vital rule of law in this state." (P. 884.)

*Dean,* like *Modesto,* involved interrogation of a material witness who constituted the only known lead to the missing person's whereabouts. *Dean,* however, involved questioning in the heat of action—which may be considered part of the res gestae accompanying an actual arrest. Statements on such occasions have a special place in the hearsay rule, and quite properly so, for they involve conjunctive words and action, which, like sea and land meeting on a beach, come together to form their own substance. An example of such spontaneous questioning appears in the instant case, where immediately on Riddle's capture near the freeway he was asked where the girl was. Nevertheless, even though *Dean* involved spontaneous questioning at the scene of an arrest and not the formal interrogation of *Modesto,* it, too, exemplifies the elements that create a state of emergency.

■ From these two cases we deduce that an emergency sufficient to excuse the *Miranda* requirements contains the following elements:

1. Urgency of need in that no other course of action promises relief;

2. The possibility of saving human life by rescuing a person whose life is in danger;

3. Rescue as the primary purpose and motive of the interrogators.

■ Do the facts at bench contain the elements necessary to bring it within this limited exception? More specifically, at the time of Sergeant Morck's questioning of Riddle at 8 a.m. on December 3 in the Arcadia police station did a valid emergency exist?

1. *Urgency of need.* As mentioned earlier, the crime had been reported the previous night at 8:45 p.m. with the disappearance and suspected kidnaping of Mrs. Kane. At that time the police had no information to indicate she was not alive. Seven hours later Riddle was caught with property from the Kane household in his automobile and in possession of Renee Kane's personal effects—her pearl ring, wrist watch, purse, keys, and credit cards. Aside from Riddle himself there were no leads where

she might be found, no clues to follow up that could promise her rescue. He was the sole material witness, and held the key to her rescue if still alive.

2. *Possibility of rescue.* The questioning took place 11 hours after Renee Kane's reported disappearance. The police still had no information whether she was alive or dead. That morning the police knew Renee Kane had disappeared the night before during an apparent burglary, and that Riddle had been caught in possession of household property from the Kane house and in possession of Mrs. Kane's personal effects. Other than this, they had no knowledge of her fate or the state of her health. However, a strong inference arose that her situation was not good, that she might urgently need help. This, of course, was no more than speculation, but it was logical speculation, fueled to a degree by hope for the best. She could be dead, injured, unconscious in a ditch, helpless in a ravine, locked in a closet, or confined in an auto trunk. Exposed to the elements she might die of shock. Closely confined she might suffocate. Eleven hours after her reported disappearance, it was still reasonable to hope she might be alive, for it is a common happening that even persons beaten and left for dead may survive for a considerable time. As yet the police had no knowledge that homicide was involved, and the possibility of rescue still seemed realistic.

3. *Rescue as primary motivation.* We must also inquire into police motivation—whether the principal purpose of police questioning was rescue, and, if their motive was necessarily a combination of rescue and criminal investigation, whether their activity was the sort the law seeks to discourage and suppress.

Undoubtedly, the primary motive of the police on the morning of December 3 was rescue. As noted earlier, a person in the mountains of California in December, injured and unattended, can quickly die of exposure. Only a few hours had elapsed since the discovery of the crime, and it was still feasible to hope that Renee Kane might be lying somewhere, unattended, but still alive. If she were injured and unconscious in some ravine, failure to question Riddle might forfeit her life. Police efforts focused on one question—where was Renee Kane? This was the question put to the material witness, who appeared to be in a position to give an answer.

Riddle, however, was not only a material witness but a criminal suspect in custody for suspected theft, burglary, and kidnaping. Quite likely, any

information obtained from him which would assist in the discovery of Renee Kane, dead or alive, would incriminate Riddle, either for murder or kidnaping, or as accessory to crimes committed by others. Obviously, the police were aware of the dual purpose served by their inquiries.

Quaere, do we wish to discourage the police from making inquiries of a material witness in custody in an attempt to save human life because the witness is also a criminal suspect and these same inquiries could assist criminal investigation by incriminating the suspect? Is it public policy to discourage or encourage this type of information seeking? Do we inhibit efforts to rescue a victim whose whereabouts are unknown and who may be alive? Do we foreclose exploration of the sole rescue lead before us? Suppose an American Aldo Moro kidnaping, with the victim possibly still alive, in the course of which a material witness is caught in possession of Moro's wallet, identification papers, and personal jewelry. · Do we encourage or discourage the police from seeking information about the victim's whereabouts from the witness who holds the only known key to rescue? Do we require that before the police ask the victim's whereabouts, they must warn the witness he need not answer questions and may consult a lawyer at no expense? We know that any lawyer worth his salt will advise his client to say nothing. The dilemma was well put by Jackson, J., in *Watts* v. *Indiana* (1949) 338 U.S. 49, 59 [93 L.Ed. 1801, 1808-1809, 69 S.Ct. 1347], concurring opinion, when he said: "To subject one without counsel to *questioning* which may and is *intended to convict* him, is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime, because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent —and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this conception of criminal procedure, *any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.*" (Italics added.) But it may be seen that Jackson's comment pertains to questioning intended to convict and not to questioning intended to rescue. We resolve the dilemma by holding that the primary motive of rescue controls the secondary motive of criminal investigation until such time as the primary motive has ceased to be realistic. Accordingly, under circumstances of extreme emergency where the possibility of saving the life of a missing victim exists, noncoercive questions may be asked of a material witness in custody, even though answers to the questions may incriminate the witness. Any other policy would reflect indifference to human life.

We conclude, therefore, that at the time of the 8 a.m. questioning a valid emergency existed, in that the need for action was urgent, the possibility of saving human life was present, and the primary motive for police questioning was rescue. Accordingly, delivery of the *Miranda* warnings was excused by exigent circumstances. Cases such as *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232], are not in point, in that they deal with the right to assistance of counsel after arraignment and assignment of a lawyer to the defendant, i.e., after proceedings have been initiated in court, after the suspect has become an accused, after the accused possesses a lawyer. The court made this clear in *Brewer, supra,* by stating that "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." (P. 401 [51 L.Ed.2d 424, 438].) *Brewer* likewise differs sharply from the situation at bench in the time factor and in the possibility of rescue. There, temperatures were freezing, it was snowing, and 48 hours had elapsed since the missing person's disappearance. The victim was assumed to be dead, and discussion with the defendant centered on "decent Christian burial." Here, there was both hope and possibility that Renee Kane might still be alive.

We hold, therefore that conversation M-1 was admissible in evidence, as were conversations M-2, M-3, and M-4.

### O Interrogation

■ There remains for discussion the six-minute O interrogation, which took place at 5:05 a.m. on December 3 in Arcadia Methodist Hospital in the presence of a doctor and two nurses. At the start of that interrogation Riddle was given the full *Miranda* warnings, but thereafter the facts of his legal position were harshly pointed out to him, and he was urged to answer questions to avoid prosecution for felony murder. In effect the *Miranda* warnings were given, and then taken back. Lieutenant Ostler told him in substance: If Renee Kane is dead, we are going to charge you with felony murder, which carries the death penalty; but if you help us now, we may find her still alive. "Where is she," was the question he put to Riddle no less than seven times. Ostler's interrogation presented an uncompromising but substantially accurate depiction of Riddle's legal position. Ostler's statements, although primarily structured to save human life, may be equally construed as threats and promises designed to secure an admission or confession. If they had produced a confession, it could be strongly urged that threat of legal prosecution

brought about the confession, and the legal issue would be whether the threat of legal prosecution in the course of a rescue attempt renders a confession involuntary and inadmissible. However, that question is not before us. The interrogation produced no reaction and no reply. Its duration of six minutes in the presence of a doctor and two nurses bears little resemblance to third-degree interrogation. Riddle made no response and remained silent throughout. He neither demanded a lawyer nor requested that the interrogation be stopped. Riddle himself testified at the pretrial motion to suppress evidence,[2] and again at the trial,[3] that he was aware of, and understood what was said to him, that in his own interest he elected to remain silent—which in fact he did. The interrogation thus produced no tangible results, and the improprieties of the questioning became moot.

On appeal defendant argues that the threatening nature of the Ostler interrogation intimidated him and thus not only vitiated all deliveries of *Miranda* warnings, but tainted all subsequent admissions and confessions. Neither the facts in evidence nor Riddle's testimony in the trial court support this contention. Riddle testified that he had his rights in mind during subsequent interviews and that he never made the admissions and

[2]"Q. Mr. Riddle, I would like to once again direct your attention to the time in which you were at the Arcadia Methodist Hospital. Is it your testimony that when Lt. Ostler was making the statements to you that ultimately were reflected in the tape recording here in court that you were in fact conscious and awake and did in fact understand what he was telling you? A. Yes, sir. Q. When he explained to you the gravity of these charges and told you that you had a right to a lawyer and that you could remain silent, was your state of mind such that you could think over what he said and reflect on those matters? A. Yes, sir. Q. You have heard testimony given in this court that you never responded to any of the questions or statements put to you by Lt. Ostler; is that true? A. Yes, it is. Q. Was there some reason why you did not answer Lt. Ostler or make any verbal replies? A. Yes, sir. Q. What were those reasons? A. At the time I was in pain and I was confused about the events that had just happened. I felt that it would be better for me just to remain silent and not say anything."

[3]"Q. You heard Mr. Ostler tell you that you had a right to a lawyer, didn't you? A. Yes, sir, I did. Q. And you heard him tell you that anything that you said could be used against you, and, in fact, would be used against you in a court of law? A. Yes, sir. Q. Did you chose to remain silent? A. I did.

". . . . . . . . . . . . . . . .

"Q. But you decided to keep your eyes shut and your mouth closed and not to answer any questions. A. That is correct. Q. And you did that of your own free will? A. Yes, sir, I did.

". . . . . . . . . . . . . . . . .

"A. At the hospital, I elected because of the situation to remain silent. Q. And that was the time that you knew that the police were concerned not with your traffic citation but with the disappearance of Renee Kane; isn't that right? A. At that time I was informed that they were concerned about a murder, yes. Q. You didn't speak up at that time and say, I didn't murder anyone, did you? A. No, sir. I didn't make any statement at all. Q. You didn't make any statement at all? A. That is correct."

confessions attributed to him.[4] The trial court found the subsequent conversations voluntary and unaffected by anything that had taken place earlier. We find nothing in the evidence that would lead us to a different conclusion.

Lastly, defendant argues that Lieutenant Ostler misstated the law during his 5:05 a.m. interrogation on December 3. On fundamental points his statements were generally correct, and we doubt that at that time and place and under emergency circumstances a judge would have done much better in outlining the law of homicide and of evidence. But in any event, Lieutenant Ostler's strictures were unproductive and produced no result. Errors, if any, in his legal analysis were immaterial.

To conclude, defendant's admissions and confessions at M-1, M-2, M-3, and M-4 were all properly received in evidence. Other points on appeal are insubstantial and do not merit discussion.

The judgment of conviction is affirmed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied September 1, 1978, and appellant's petition for a hearing by the Supreme Court was denied September 27, 1978.

---

[4]"Q. Did you still have in mind the advisement of the rights that Lt. Ostler had given you earlier, telling you you had a right to a lawyer and you had a right not to incriminate yourself? Did you still remember those statements? A. Yes. Q. And you knew you were being transported to the search area that you were a suspect in a murder-kidnapping case, didn't you? A. Yes, sir. Q. And you knew the gravity of those crimes, didn't you? A. Yes, sir.

". . . . . . . . . . . . .

"Q. And, as a matter of fact, you did know your rights, didn't you? A. Yes, sir. Q. Lt. Ostler had given them to you very clearly, hadn't he? A. Yes. Q. And you still remembered those rights? A. Yes. Q. And did you know you had a right to remain silent? A. I did. Q. And you knew you had a right to a lawyer? A. I did."