[Crim. No. 4624. Fifth Dist. May 19, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
ROSA SALINAS, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Antonia D. Radillo, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Theodora Poloynis-Engen and Nancy Sweet, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ZENOVICH, J.**—Appellant, Rosa Salinas, appeals from a judgment of conviction of second degree murder (Pen. Code, § 187) and of inflicting cruel and corporal punishment on a child (Pen. Code, § 273d). The court sentenced her to the middle term of six years on the murder conviction and imposed a concurrent term on the conviction of corporal punishment upon a child.

## THE EVIDENCE

In September 1978, Emma Rios was living at 6421 Huntsman in Selma with her husband and two children. Appellant, Rosa Navarro, also known as Rosa Salinas, was also living at that address. Rosa was living there with her husband, Raudell Salinas and her three children, including Micaela Salinas (Micki), the victim.

In mid-August, Emma first saw Rosa strike Micki; she was hitting her with a belt on the back and wherever she could hit her. Emma saw bruises on Micki's face and her lips were swollen. Thereafter, Emma called the sheriff.

During August and September, Rosa hit Micki about eight times, although several times she did not hit her very hard. She also saw Rosa pull Micki's hair on two occasions. Although she was able to get around the house, Micki would not walk around much. She spent most of the time sitting in the living room. When they would get up to eat, Rosa would tell Micki to sit down and the child would stay put.

On August 21 and September 6, Rosa hit Micki with the belt. After the incident on September 6, Emma saw bruises on Micki's back.

The next incident of beating Emma testified to occurred on September 7. On that date, Emma saw Rosa and Micki in the bathroom. About a half hour prior to this, Rosa heard Micki intermittently cry and Rosa would tell Micki to shut up. Emma heard Rosa yelling like she was really mad and she also heard what she thought was Micki being spanked with a belt. After this half hour, Emma went to get her baby some food and she passed by the bathroom. She saw Rosa and Micki in there and Rosa had a belt in her hand.

Emma then went back to her room where her husband and baby were. Emma was familiar with the sounds of a belt and she heard Rosa strike Micki with the belt. Rosa heard the sounds go on for about one to one and a half hours.

When Emma returned to the bedroom, her husband had a tape recorder and he began taping Rosa's shouting, Micki's crying and the sounds of the belt and sounds that were made by hitting the shower. An edited version of the tape was played to the jury.

The next day, September 8, Emma and Rosalio Estrada (Emma's husband) saw Micki in the bathroom with Rosa. Rosalio noticed that Micki was moving around, was crying and Rosa had a belt in her hand.

After making the tape recording (which was subsequently given to Detective Shirley Fernandez), the Rioses left the house and did not return until that evening and did not see anyone at home at the time.

At about noon on September 8, Rosa called Sally Salinas, Rosa's sister-in-law, to come over to her house. When Rosa called, she said Micki had been having fainting spells for about five days. Sally went over and saw Micki lying on the bed unconscious. Apparently, Rosa was trying to revive the child with alcohol. Rosa told Sally that at

about 11 o'clock Micki fell out of her chair when she was eating. Sally noticed some bruises on the child's head. Rosa also suggested going to a clinic.

Sally left but Rosa called her back at about 3 p.m. Rosa wanted Sally to go interpret for her because a sheriff was there. She told Sally to tell the sheriff that Micki had fallen off the front stairs. Sally told the sheriff this. When the officer stepped outside, Rosa said, "they are going to think I did it."

Fresno Deputy Sheriff Kerns testified that at about 2:45 p.m. he went to the house to investigate possible child abuse. He encountered appellant who eventually asked Sally Salinas to come over and translate. Officer Kerns explained why he was there and the women took him to a bedroom where he saw a motionless three- or four-year-old child covered with a bed sheet. He initially thought the child, Micki, was a boy instead of a girl because of the closely cropped hair. He noticed bruises on her head and a few open cuts and bruises on her arms. The child was having difficulty breathing and he checked her pulse which was weak. The child's eyes were dilated and she did not respond to his voice or touch. Kerns immediately radioed for an ambulance.

Rosa and Sally were with Kerns and he asked what happened to the child. Rosa told him that while the child was eating lunch she had a seizure and fell and received some bruises and injuries. The officer pulled Micki's shirt up and saw other bruises on the abdomen area.

The ambulance arrived and the child was taken to Valley Medical Center. Rosa accompanied Officer Kerns to the hospital.

At the hospital, the officer told one of the doctors that he had been told that the child had a seizure and sustained injuries. Officer Kerns was present when appellant was arrested.

During the entire time Kerns was at the residence, Rosa appeared calm and she did not appear to be upset at all. However, after she was placed under arrest she began crying.

In the afternoon on September 8, Wallace Carroll, M.D., was in the emergency room when he saw the victim who was bruised, unconscious and was posturing, indicating that she had some sort of brain damage at the time. Although the victim had bruises all over her body, the

darkest bruises were on her face and buttocks. Carroll noted most of the bruises were red in color and were thus about 48 hours old or less. The bruises on the head were primarily on one side. The victim was unresponsive to any stimuli and the nature of her symptoms indicated brain damage. The initial diagnosis revealed a large amount of swelling of the brain, particularly on the left side. He diagnosed Micki as having a subdural hematoma.

Shortly after doing a brief examination, Carroll spoke with Rosa to obtain a medical history. He asked her what happened and she indicated that the child had been ill for five days, had been fainting and had "attacks." Also, Micki had fallen down a couple of stairs during one of the attacks, and that on the day she was admitted Micki had fallen from a table and chair and did not wake up.

The doctor felt that the history given by Rosa was not consistent with the injuries; he suspected child abuse. Given the amount of brain damage, it was unlikely that the victim would have been up and about, eating and sleeping. It would not have been possible to lead a normal life. While the subdural hematoma could have occurred before September 7 and 8, he felt the injuries were of more recent origin.[1]

Vigorous shaking or blows may cause a subdural hematoma. Carroll further testified that it was difficult to state whether the bruises on the victim's cheeks caused the subdural hematoma.

A pathologist performed an autopsy on Micki on September 20. He opined that the cause of death was a subdural and cortical hemorrhage or hematoma. Any one of the bruises could have caused a subdural hematoma. Also, it was more likely that the force applied resulting in the subdural hematoma occurred on September 8, rather than on September 7. However, the trauma on the 7th could be such that it would have taken little force on the 8th to cause the subdural hematoma. Bruises on the skull and a blow could have caused the hematoma.

Raudell Salinas, Rosa's husband, testified that he cut Micki's hair at Rosa's behest because it was falling out and he felt this would help her

---

[1]Dr. Carroll defined a subdural hematoma as when blood vessels between the brain and a tough member called the dura are broken, and the bleeding has nowhere to go except to push in and cause a great deal of pressure on the brain. A large subdural hematoma can lead to death.

hair to grow back healthy. This was a custom and "home remedy" in Mexico. He never saw his wife mistreat the child or pull at her hair.

### THE DEFENSE

Rosa Salinas, aged 25, testified in her own behalf. Before July 1978, Micki had been living with the Mendoza family and Rosa saw Micki every month. Rosa asked the welfare authorities to get the child back, and when Micki eventually came to live with her she was happy. On occasion, Micki mentioned the Mendozas and, while appellant did not hold anything against them, she felt badly.[2]

Emma Rios was part of the other family that lived in the same household with Rosa. When Micki would not obey her and go off with Emma, this made Rosa feel worse.

The first time she actually spanked Micki was around August 28 or 29. She spanked her because she felt badly about everything and because Micki went to the bathroom in her pants. Rosa felt like she was choking, her body shook and she could not stand up. She hit her with a sandal on the buttocks and legs and felt anger, although not with Micki. She could not stop hitting her. She also recalled that she grabbed Micki, threw her on the bed and, in the process, Micki grabbed the edge of the heater or the bed and hit herself on the mouth. Prior to this time, she had not hit Micki with the belt but would just scold her.

Micki had hair falling out of her scalp and appellant did not know the cause. She did not ever pull at her hair, but she would like to touch it.

On September 7, she became angry at Micki because Micki was with Emma. Emma had gone somewhere and Micki went with her. Emma also called Rosa a bitch. They returned and Micki then pushed her younger stepsister which angered Rosa. Rosa felt herself choking and her body was shaking. Running through her mind were memories of when the authorities took Micki from her and she felt jealousy when Micki mentioned the Mendozas.

She then got a leather child's belt and took Micki in the bathroom. Micki said she wanted to go back to the Mendozas and Rosa felt jeal-

---

[2]It was stipulated that Micki was taken away from Rosa between the ages of six months to one year because of neglect and not abuse.

ous. Rosa began hitting Micki with the belt and was yelling. She wanted to stop but could not; she did not want to hurt Micki.

On September 8, the following day, she did not strike Micki. However, in the morning she fell and Rosa picked her up.

Rosa also called Lars Julin, M.D., a family practitioner, who first came into contact with appellant in July 1978. He treated her for bronchitis and described appellant as being a "hysteroid personality" type. This type of person tends to overreact to stimuli and can go into an hysterical condition. This type of personality can act irrationally. The doctor concluded appellant had this type of personality because her symptoms or complaints were far more pronounced than the physical findings. The doctor did not see Rosa as a patient at any time after August 10 and did not see her in September.

DISCUSSION

I

Appellant contends that statements made to Officer Kerns and Dr. Carroll were erroneously admitted because she had not been given her *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) We are not persuaded.

■ We begin by noting that the trial court's ruling on the *Miranda* issue may not be set aside by a reviewing court unless it is "palpably erroneous," i.e., unsupported by substantial evidence. (*In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549].) As to conflicting testimony, this court must accept the version of events most favorable to the People to the extent that it is supported by the record. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 300 [168 Cal.Rptr. 603, 618 P.2d 149].) Finally, where the facts are uncontradicted, the reviewing court must independently determine beyond a reasonable doubt that the incriminating statement was properly admitted. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446].)

We first examine the evidence adduced at the admissibility hearing regarding Fresno County Deputy Sheriff Kerns.

On September 8, 1978, Deputy Sheriff Kerns went to 6421 East Huntsman in Selma. He was told that there had been a possible child

abuse. The dispatcher also told him that the anonymous caller stated that there was a child screaming.

When he arrived, he went to the front door and met appellant. Appellant apparently made a phone call as Sally Salinas came over to interpret.

Kerns explained to Sally why he was there. He then entered the residence and went to a bedroom where he saw Micki lying motionless and face up. She appeared to have difficulty breathing and he noticed numerous bruises and cuts on her head, arms and body and her eyes were dilated a great deal.

Kerns testified that he knew the child had been injured and he was suspicious the child had been abused.

Kerns immediately requested an ambulance. Kerns saw more bruises and, on cross-examination, he testified he suspected that the mother committed the child abuse, although he "couldn't focus all [his] attention toward the mother at that time."

After being told that the ambulance was on its way, Kerns attempted to get medical information; he asked the name, age and how the injuries had been sustained. Appellant told him that the child had a seizure at about noon and had fallen down.

After the ambulance arrived, the paramedics requested that a parent go to the hospital to provide permission for any medical procedures that might have to be done. Kerns told Sally about this and asked if appellant could accompany him to the hospital. Appellant then went with him to the hospital.

Kerns testified that he was concerned with the life of the child and his first impression was that the child might die in his presence. Moreover, the reason he did not intend to arrest appellant at the hospital was because en route to the hospital he called the sheriff's department to have a Spanish-speaking detective come out who would speak with appellant, do the investigation and make the decision whether to arrest appellant.

Kerns further testified that appellant was not under arrest. However, if appellant had turned around and begun to walk away he would have stopped her.

Although he suspected appellant in the child abuse, if there was anyone else living at the residence they would also possibly be suspects. When he was at the house, he was told that appellant's husband was living there.

After the evidence was taken and without argument, the trial court ruled that appellant's statement to the officer was admissible. The trial court reasoned that there was no custodial interrogation and, although it was obvious appellant was under some suspicion, the officer was concerned about the welfare of the child and did not engage in any custodial interrogation so as to require a *Miranda* warning.

Appellant contends that the focus of the interview shifted from investigation to accusatory in a short time. Kerns suspected appellant and would not have allowed her to leave the premises. Thus, *Miranda* warnings should have been given. Not so.

*Miranda* warnings are not required simply because police question someone whom they suspect. The warnings are only required when there has been such a restriction on a person's freedom as to render him "in custody," inasmuch as it was that sort of coercive environment to which *Miranda* was made applicable. (*Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711].)

The test of custody is not dependent upon the subjective intent of the interrogator. (*People* v. *White* (1968) 69 Cal.2d 751, 760 [72 Cal.Rptr. 873, 446 P.2d 993].) The question is, "whether the suspect was actually deprived of his freedom in any significant way or, as a reasonable person, was led to believe his freedom of movement was restricted by the pressures of official authority." (*People* v. *Blouin* (1978) 80 Cal.App.3d 269, 283 [145 Cal.Rptr. 701].)

Whether custody has attached short of actual arrest depends upon a number of factors, including: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the indicia of arrest are present; and (4) the length and form of the questioning. (*People* v. *Herdan* (1974) 42 Cal.App.3d 300, 306-307 [116 Cal.Rptr. 641].)

The cases uniformly hold that when a person is temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation, no *Miranda* warnings need be given

"until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive." (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 669 [74 Cal.Rptr. 423]; see also *In re Danny E.* (1981) 121 Cal.App.3d 44, 50 [174 Cal.Rptr. 123]; *People* v. *Haugland* (1981) 115 Cal.App.3d 248, 256 [171 Cal.Rptr. 237]; *People* v. *Carter* (1980) 108 Cal.App.3d 127, 130-131 [166 Cal.Rptr. 304]; *People* v. *Patterson* (1979) 88 Cal.App. 3d 742, 747 [152 Cal.Rptr. 183].)

 In the case before us, there was no evidence from which appellant, as a reasonable person, could have concluded that she was in custody. (*People* v. *Blouin, supra*, 80 Cal.App.3d 269, 282-283.) The questioning was of short duration and was conducted in front of appellant's home with no evidence of any coercive environment. (*Id.*, at p. 283; see also *People* v. *Murphy* (1982) 127 Cal.App.3d 743, 748 [179 Cal.Rptr. 732].)

Although Officer Kerns clearly suspected appellant, he had a right to detain her for the purpose of on-the-scene investigation, at which time no *Miranda* warnings were required. (*People* v. *Manis, supra*, 268 Cal. App.2d 653.)

The question about how the injuries were sustained was not accusatory in nature, but was asked in the course of obtaining the medical history. In fact, Officer Kerns relayed what information he had to the ambulance attendants from which it can be inferred that the purpose of the questioning was not accusatory but was merely to facilitate any medical attention that may have been required. In an emergency medical situation, a reasonable person would expect to be asked what had happened pursuant to an on-the-scene investigation, especially where the injured party was a child whose mother was being questioned.

The indicia of arrest were also not present, inasmuch as the officer asked appellant to accompany him to the hospital to grant permission in the event medical attention was needed. Officer Kerns did not ask her to come along for the purpose of questioning. Moreover, appellant accompanied the officer after the questioning regarding the source of the injury. Thus, a reasonable person would not feel the coercion inherent in accompanying an officer in a patrol car when the person had no idea she would be asked to do so.

Thus, we conclude appellant was not in custody when asked the questions by Kerns. The trial court's ruling was supported by substantial evidence. (*In re Eric J., supra*, 25 Cal.3d 522, 527.)

We now examine the evidence regarding Dr. Carroll. The thrust of appellant's argument is that Dr. Carroll was an agent of the police and was therefore required to give *Miranda* warnings.

At the admissibility hearing, Dr. Carroll testified that he briefly examined Micki on September 8 but had not formed any opinion as to the cause of the child's injury. Before speaking with appellant, he did not go into any history with the sheriff's officers and had not been requested by them to ask appellant any questions.

Carroll then spoke with appellant for the purpose of obtaining a history so as to determine the cause of the child's admission to the hospital and to corroborate those causes with the physical examination; such a history is done with every patient.

Carroll initiated the conversation with appellant. Because it was too noisy and harried in the emergency room, Carroll went with appellant to a small room with privacy called the quiet room. Deputy Sheriff Shirley Fernandez was also there as a translator, although Dr. Carroll spoke to appellant in Spanish. Apparently, other officers were present although he did not request their presence.

When they went to the quiet room, someone said to appellant, "remember that you have the right to have a lawyer present." Appellant said yes and she acknowledged.

Carroll's primary concern was with diagnosing the child, although he was also concerned with appellant and how this was affecting her.

Carroll asked appellant what happened and she said the child had a fainting spell five days prior to being brought to the hospital and that she had been having seizures over a five-day period. Appellant continued that on the day before the child had fallen down two steps and apparently had some kind of seizure that resulted in her becoming unconscious.

After taking the history of the "present illness," appellant said she was tired of talking and was again advised she had a right to have a

lawyer present. She then said she did not want to talk any more and the officers left. This was about 30 minutes after the conversation had begun. Thereafter, Carroll continued to take the medical history.

It was not Carroll's intent to provide information to law enforcement officers and the medical report was a standard part of the business procedures at the hospital. He would have obtained a history even if the officers were not present.

On cross-examination, Carroll testified he had attended seminars on child abuse given by social service agencies. He was taught to be thorough in his reports because at a later date he might have to testify. However, it was not his object to obtain information with a view to testifying, although it was in his mind that he might have to testify.

When he was attempting to get the medical history, he had suspicions that the child may have been abused. Under the circumstances, he had suspicions Rosa was responsible; he knew appellant had been arrested because the police department felt she may have done it and he knew the child had multiple trauma. (We note the record is unclear when appellant was arrested.)

After the hearing, defense counsel argued that the doctor, in addition to getting the medical history, was attempting to secure evidence as an agent of law enforcement.[3] However, the trial court ruled that there was "absolutely no evidence" that he acted as an agent for the police and *Miranda* did not apply. The trial judge reasoned that the doctor was asking questions on his own behalf for the treatment of the child. Primarily, he was trying to diagnose the child's condition and the child was in an "extreme situation."

■ Before us appellant argues that, under Penal Code sections 11161.5 and 11161.7 requiring physicians to report any suspected child abuse to the local police, Dr. Carroll was an agent of the police. Appellant cites numerous search and seizure cases, including *People* v. *Zelinski* (1979) 24 Cal.3d 357 [155 Cal.Rptr. 575, 594 P.2d 1000] and *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628 [114 Cal.Rptr. 114, 522 P.2d 674]. We find these cases inapposite.

---

[3]We have taken judicial notice that Valley Medical Center ·in Fresno County is a governmental entity. However, this fact is of no benefit to appellant. (See *People* v. *Wright* (1967) 249 Cal.App.2d 692 [57 Cal.Rptr. 781].)

*People* v. *Zelinski, supra*, 24 Cal.3d 357 involved store detectives who exceeded the limited powers of private search granted by statute. The court saw state involvement where security personnel acting in aid of law enforcement exceeded the narrow state-conferred citizen search privilege and exclusion seemed an appropriate and effective way to deter such unlawful invasions within the growing private security sector. The facts and the policy enunciated in *Zelinski* simply have no bearing in the instant case. Similarly, in *Dyas* v. *Superior Court, supra*, 11 Cal.3d 628, 636, the court held that a search by a uniformed patrolman of the Housing Authority of Los Angeles violated the defendant's constitutional rights. The court looked at the patrolman's duties and concluded they included enforcing penal statutes and regulations on or about housing property. Moreover, he was in the course of discharging those duties when he searched defendant without probable cause or a warrant. (*Ibid.*) The court also noted that the controlling question in determining whether the exclusionary rule should be invoked is not the mission of the government agency but whether the particular governmental employees and others similarly situated would be deterred from engaging in illegal searches and seizures; that question depends on such considerations as the training or experience, responsibilities and duties of the employee in question. (*Id.*, at p. 635.) *Dyas* is distinguishable on factual and legal grounds when one examines Dr. Carroll's duties and the concept of deterrence of illegal activities.

In former Penal Code sections 11161.5 and 11161.7 (repealed by Stats. 1980, ch. 1071, §§ 1, 3, p. 3420, now Pen. Code, §§ 11165-11174), the Legislature set out certain requirements regarding reporting child abuse. The applicable parts of those code sections are: "In any case in which a minor is brought to a physician and surgeon, dentist, resident, intern, podiatrist, chiropractor, marriage, family or child counselor, psychologist, or religious practitioner for diagnosis, examination or treatment, or is under his charge or care, or in any case in which a minor is observed by any registered nurse when in the employ of a public health agency, school, or school district and when no physician and surgeon, resident, or intern is present, by any superintendent, any supervisor of child welfare and attendance, or any certificated pupil personnel employee of any public or private school system or any principal of any public or private school, by any teacher of any public or private school, by any licensed day care worker, by an administrator of a public or private summer day camp or child care center, or by any social worker, by any peace officer, or by any probation officer, and it appears to the physician and surgeon, dentist, resident, intern, podia-

trist, chiropractor, marriage, family or child counselor, psychologist, religious practitioner, registered nurse, school superintendent, supervisor of child welfare and attendance, certificated pupil personnel employee, school principal, teacher, licensed day care worker, administrator of a public or private summer day camp or child care center, social worker, peace officer, or probation officer, from observation of the minor that the minor has physical injury or injuries which appear to have been inflicted upon him by other than accidental means by any person, that the minor has been sexually molested, or that any injury prohibited by the terms of Section 273a has been inflicted upon the minor, *he shall report such fact by telephone and in writing, within 36 hours, to both the local police authority having jurisdiction and to the juvenile probation department; or, in the alternative, either to the county welfare department, or to the county health department.* The report shall state, if known, the name of the minor, his whereabouts and the character and extent of the injuries or molestation.

"Whenever it is brought to the attention of a director of a county welfare department or health department that a minor has physical injury or injuries which appear to have been inflicted upon him by other than accidental means by any person, that a minor has been sexually molested, or that any injury prohibited by the terms of Section 273a has been inflicted upon a minor, he shall file a report without delay with the local police authority having jurisdiction and with the juvenile probation department as provided in this section.

". . . . . . . . . . . . . . .

"Copies of all written reports received by the local police authority shall be forwarded to the Department of Justice . . . ." (Pen. Code, § 11161.5, subd. (a), italics added.)

"The Department of Justice, in cooperation with the State Office of Child Abuse Prevention, shall adopt and cause to be printed, for dissemination through the various county welfare departments, a form which may be used by reporting professional medical personnel in making reports required to be made pursuant to Section 11161.5." (Pen. Code, § 11161.7, subd. (a).) The changes enacted in the new reporting statutes (Pen. Code, § 11165 et seq.) are not relevant to our discussion and would not change our result.

We are cited to no case in California dealing with the issue of whether a doctor is a police agent under the circumstances of this case. In certain other jurisdictions, the cases indicate that *Miranda* does not apply generally to medical personnel because there is no custodial interrogation. (See generally, Annot.·(1970) 31 A.L.R.3d 669-670, § 26 and pocket pt.; *State v. Hathorn* (La. 1981) 395 So.2d 783; *State v. Sanchez* (1971) 94 Idaho 125 [483 P.2d 173]; cf. *Estelle v. Smith* (1981) 451 U.S. 454,· 468 [68 L.Ed.2d 359, 372, 101 S.Ct. 1866, 1875-1876] (*Miranda* applied to court-appointed psychiatrist); *In re Spencer* (1965) 63 Cal.2d 400, 410 [46 Cal.Rptr. 753, 406 P.2d 33] (right to counsel when court-appointed psychiatrist interviews defendant); *People v. Polk* (1965) 63 Cal.2d 443, 449 [47 Cal.Rptr. 1, 406 P.2d 641]; *People v. Mosher* (1969) 1 Cal.3d 379, 397 [82 Cal.Rptr. 379, 461 P.2d 659].)

In *State v. Hathorn, supra,* 395 So.2d 783, a case worker with a child protection center interviewed defendant in an emergency room at a hospital after receiving a referral concerning alleged abuse. Defendant freely spoke with the case worker and inculpated herself for abusing her children. (*Id.,* at p. 785.) Some days later, the case worker again interviewed the defendant. The court held that the statements were freely and voluntarily made and that *Miranda* warnings did not apply. The court reasoned that defendant was not placed under arrest by the case worker, nor was the case worker a law enforcement officer with powers of arrest. The statements were made in a noncustodial situation and defendant was not being subjected to interrogation by a police officer. (*Ibid.*) ·

Upon careful examination of the record before us, we do not believe the Penal Code sections cited by appellant made Dr. Carroll a police agent in this case. First, we find it difficult to see how the reporting requirements mandated by Penal Code section 11161.5 have any application at all in the instant case. By the time Dr. Carroll spoke with appellant, there was really nothing to report. Law enforcement authorities already suspected abuse based on Deputy Kerns' observations and appellant was in custody. By this time, it would be unnecessary for Carroll to telephone and report in writing to the local police authority and juvenile probation department (see former Pen. Code, § 11161.5) regarding the fact of any "observations" of abuse. Thus, the reason for Dr. Carroll allegedly being an agent under the statute was simply not present.

Second, we believe respondent is correct in asserting that the purpose of the statute is to bring cases of suspected child abuse to the attention of police authorities as early as possible because of the potential danger to the child when he remains with the abusing parent. Although former Penal Code section 11161.5 required certain professionals and others to report cases of suspected child abuse to the local police and juvenile probation department or to the county health department, this reporting requirement alone would not necessarily make the reporting individual a police agent. The statute only requires certain people to cooperate with the named authorities for the child's welfare. The statute does not impose any investigative duties on the alleged "agents."

Third, we believe there are several policy considerations which militate against a finding of agency based on the statute. First, Dr. Carroll needed to take a medical history and obtain certain information in this emergency situation. In balancing the interests of the child's well being, particularly in an emergency situation where a life is at stake, versus the need for protecting the alleged abuser's right against self-incrimination, we believe there is no question that the former interest outweighs the latter. (See, e.g., *People* v. *Riddle* (1978) 83 Cal.App.3d 563, 572-579 [148 Cal.Rptr. 170].) "Any other policy would reflect an indifference to human life." (*Id.*, at p. 578.)

The second policy consideration is that the old and new reporting statutes require a broad spectrum of people (from social workers and summer day camp administrators to physicians and dental hygienists) to report child abuse to the named agencies. If we were to require Dr. Carroll to give *Miranda* warnings in this case, then we would be compelled to hold the other people specified above to be police agents under the statute. *Miranda* would be extended far beyond whence it came, i.e., custodial interrogation by the police.

Fourth, even if Dr. Carroll questioned appellant in the presence of police officers, arguably a coercive circumstance, this did not necessarily make him a police agent. (*In re Eric J., supra*, 25 Cal.3d 522, 526-527.) In *Eric J.*, a police officer drove a victim of a theft to a location where defendant was possibly selling the stolen property. The victim (i.e., the manager of the business that had been burglarized) questioned the defendant on his own initiative and the officer did not suggest or arrange he do so. The officer, while present during the conversation between the victim and the defendant, did not participate in it. Defendant confessed to the victim. We also find it significant that,

prior to the questioning, the officer knew that the victim had been burglarized and that defendant and the victim were coworkers. The court held that the police officer did not directly participate in the questioning and substantial evidence supported the implied finding of a lack of complicity between the officer and the victim. (*Id.*, at ·p. 527.) Thus, *Miranda* warnings were not required. Similarly, although police officers brought appellant to the hospital, Dr. Carroll testified that he initiated the conversation with appellant on his own. He would have taken the medical history even in the absence of officers. The police officers did not participate in the questioning, even though they stood by. In sum, Dr. Carroll was merely acting as a private party and was not an agent of the police. (*In re Eric J., supra*, 25 Cal.3d 522, 527; see *In re Deborah C.* (1981) 30 Cal.3d 125 [177 Cal.Rptr. 852, 635 P.2d 446].)

At oral argument, appellant suggested, without citation of authority, that this court impose a judicially declared rule to exclude statements made by potential abusers to doctors. She makes this argument as an alternative to the Fifth Amendment claim and asserts that it is important for the potential abuser to feel free to communicate with doctors because of the doctors' need for medical information. However, if the person knows the statements can be used against her in a criminal prosecution then she may choose silence and deprive the doctor of the necessary information. There is, of course, precedent for judicially declared rules of exclusion. (See, e.g., *People* v. *Rucker* (1980) 26 Cal.3d 368, 389 [162 Cal.Rptr. 13, 605 P.2d 843] [responses during booking interview]; *Bryan* v. *Superior Court* (1972) 7 Cal.3d 575 [102 Cal.Rptr. 831, 498 P.2d 1079] [admissions in juvenile court proceedings]; *In re Wayne H.* (1979) 24 Cal.3d 595, 601-602 [156 Cal.Rptr. 344, 596 P.2d 1] [incriminating statements made by minor to probation officer during Welf. & Inst. Code, § 628 interview].)

However, we decline appellant's invitation to impose such a rule in the instant case. First, the overriding purpose of obtaining a medical history is to treat the patient and not for law enforcement. And, as we have discussed, Dr. Carroll was not an agent of law enforcement. More importantly, we believe such a rule of exclusion should be addressed to the Legislature. The Legislature may very well conclude that a privilege would be appropriate. Nevertheless, on the scant record before us, we have no way of knowing whether appellant's basic premise is sound, let alone whether it should be the basis for a rule of law.

## II

Appellant next contends that the trial court erred in admitting evidence of prior beatings and related evidence testified to by Emma Rios and Rosalio Estrada. Upon careful examination of the record, we find there was no objection by appellant's trial counsel pursuant to Evidence Code sections 352 and/or 1101 to each of the enumerated prior acts. (Evid. Code, § 353; *People* v. *Collie* (1981) 30 Cal.3d 43, 49 [177 Cal.Rptr. 458, 634 P.2d 534]; *People* v. *Green* (1980) 27 Cal.3d 1, 21-22 [164 Cal.Rptr. 1, 609 P.2d 468]; and see Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1972) Principles of Relevancy, § 22.1, p. 290.)

Moreover, the trial court's comments reveal that it did not understand appellant's objections to be on the above grounds. (Cf. *People* v. *Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123].)

█ Appellant finally contends that the trial court erred in failing to give the defendant's requested limiting instruction on other-crimes evidence. (CALJIC No. 2.50.) Appellant contends that the jury may have incorrectly considered evidence of the other crimes in the context of the homicide charge. She further contends that we cannot tell from the record whether the jurors correctly or incorrectly applied the other-crimes evidence to the proper supporting charges. (See *People* v. *Green, supra,* 27 Cal.3d 1, 71.) Appellant notes how the jury requested a rereading of the homicide and manslaughter instructions, replaying of the tape, rereading of the doctor's testimony; thus, appellant opines the jury was carefully considering the cause of death and appellant's state of mind.

Respondent contends any error was harmless as the evidence on the requisite implied malice was substantial.

Although we believe the trial court should have given the requested instruction, we find appellant's contention without merit. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Even though the jury was not instructed that the evidence was admitted for only the limited purpose of showing malice and was thus free to apply the evidence to any purpose, the error was harmless. The evidence of malice was considerable. The vicious unprovoked battery on September 7, which was tape recorded and played to the jury, in addi-

tion to the testimony of the doctors, the admission of photographs of the victim, the prior beatings evidencing a malicious intent, plus appellant's statements that Micki had been injured due to falling which indicated a consciousness of guilt, provided ample evidence of malice in support of appellant's conviction of second degree murder.

The judgment is affirmed.

Franson, Acting P. J., and LaRue, J.,* concurred.

A petition for a rehearing was denied June 16, 1982.

---

*Assigned by the Chairperson of the Judicial Council.