Opinion
MOON, Acting P. J.
In what appears to be a case of first impression, we are asked to determine whether appellants, a pastor and assistant pastor of *Supp. 24 the South Bay United Pentecostal Church, who are also the president and principal of the South Bay Christian Academy, were properly convicted of violating the Child Abuse and Neglect Reporting Act (Reporting Act), Penal Code section 11166, subdivision (a).[1] The statute provides in pertinent part, “(a) Except as provided in subdivision (b), any child care custodian . . . who has knowledge of or observes a child in his or her professional capacity or within the scope of his or her employment whom he or she knows or reasonably suspects has been the victim of child abuse shall report the known or suspected instance of child abuse to a child protective agency immediately or as soon as practically possible . . .
Appellants raise several challenges to their convictions: (1) there was insufficient evidence to find they are child care custodians within the scope of the statute; (2) the statute, section 11166, subdivision (a), violates due process by failing to give adequate notice that pastors who are involved in church schools are within the scope of the statute; (3) the statute as applied violates both the federal and state Constitutions by infringing on appellants’ rights to the free exercise of religion and freedom of speech; and (4) the reporting statute violates the establishment clause of the First Amendment of the United States Constitution.
For the reasons set forth below, we affirm the convictions.
Facts
At trial, the victim, 20-year-old Christine G., testified she had attended South Bay Christian Academy, a school operated by the South Bay United Pentecostal Church. The school and church were located in the same building. Christine testified she had been a student at the school from age seven until she graduated from the high school at age seventeen. Appellant Arthur E. Hodges was president of the school (as well as the pastor of the church), and appellant, George Grant Nobbs was principal (and assistant pastor). Christine went to see appellant Hodges because he was the spiritual leader of the church and the head of the school.
Christine testified that when she was 17 years old (in March 1988) she decided to seek help from appellant Hodges by telling him her stepfather, Lyn M., a minister in the church, had been molesting her for many years. Christine testified she confided in a classroom teacher who, in turn, made an appointment with Mr. Hodges during the schoolday. Appellant Nobbs gave Christine permission to leave class early on the day of the appointment to see Mr. Hodges.
Christine testified she told Mr. Hodges what her stepfather had been doing to her: he touched her breasts and private parts. She testified Mr. Hodges *Supp. 25 told her that he believed her. Christine did not want him to tell her stepfather, but Mr. Hodges said that he would have to be confronted. Mr. Hodges told Christine he would make arrangements for her to leave home when he talked to her stepfather. Christine went home and stayed in her room.
Christine testified she met with Mr. Hodges the day after he spoke with her stepfather. He told her that her stepfather confessed to everything and that he would be handling the situation. Mr. Hodges told Christine not to tell anyone about what her stepfather had done to her.
A few days later Mr. Hodges called Christine back into his office. He told her he had sent her stepfather to a retreat. Mr. Hodges handed her a letter of apology from her stepfather. This was approximately two weeks after their initial meeting.
Mr. Hodges wanted Christine’s mother and stepfather to come into the office after she read the letter. Mr. Hodges wanted Christine to go home with her parents because she was seeing her boyfriend against his instructions. Christine told Mr. Hodges she did not want to talk to her parents. He insisted, and they came into the office and spoke with her. Christine pleaded with Mr. Hodges not to make her go home with them because she was afraid of her stepfather. Mr. Hodges arranged to have her parents pick her up from school the next day and bring her home. Instead, Christine ran away. She also told others about the situation even though Mr. Hodges told her not to.
After running away, Christine received instructions to return to see Mr. Hodges. She went to his office during school hours. Appellant Nobbs was also there. Mr. Hodges told her unless she returned home she would not be allowed to return to school and she would not graduate. This meeting was held approximately a week and a half after Christine was given the letter. Christine returned home and left immediately after graduation.
Raylene M., Christine’s mother, testified she was unaware her husband had been molesting her daughter until she was called to the church by Mr. Hodges. She stated Mr. Hodges insisted he handle the situation within the church. She testified Mr. Nobbs was aware of the facts, and she often went to him for strength and comfort.
Detective Duffy, a child abuse detective for the San Diego Police Department, testified that on August 19, 1988, he was assigned to follow up on a telephone call made by Christine regarding molest allegations. He stated he personally interviewed Christine. His partner interviewed her older sister, Michelle. After the interview, he decided to speak with appellants. This was *Supp. 26 in September 1988. He and his partner went to the school and spoke first with the principal, Mr. Nobbs. After they informed Mr. Nobbs of their investigation, Mr. Nobbs stated he was not at liberty to talk about the situation alone; he would have to call his superior, Mr. Hodges.
Mr. Hodges came down from his office and introduced himself as the president of the school. The officer admonished him. Mr. Hodges told the detective in general terms he was aware of the allegations of molest, that Christine had disclosed to him many of the details, and he had handled the situation regarding Christine’s stepfather. When asked why he did not report the information to the police office or child protective services or if he knew he was mandated to report, Mr. Hodges told the officer he knew of the reporting laws, and he understood he was a mandated reporter. Mr. Hodges told the officer he wanted to take care of the matter within the church. Mr. Hodges stated he disciplined the stepfather by having him write a letter of apology to the victim and by having the stepfather confess in front of the entire congregation. Additionally, Mr. Hodges took away his ministerial license. Mr. Hodges also told the officer he instructed Christine to return home; if she did not, she would not graduate.
Detective Duffy then went to Mr. Nobbs’s office. He admonished Mr. Nobbs and asked him if he was aware of the allegation of molest. Mr. Nobbs told the officer he was aware of the situation. The officer also asked him why he did not report the molest since Christine was a student at his school. Detective Duffy testified Mr. Nobbs admitted he was aware that he was a mandated reporter and knew the laws. He did not report the suspected abuse because he and Mr. Hodges wanted to resolve the situation within the church. Mr. Nobbs told the officer he, as principal of the school, could not have allowed Christine to attend school if she was not living at home. He also stated he and Mr. Hodges talked to Christine about not being able to graduate unless she returned home.
Mr. Hodges testified he is the spiritual leader of the South Bay United Pentecostal Church. He stated he met with Christine in his office, the pastoral office of the church. The meeting began with a prayer. His wife was present. He stated Christine told him she was having trouble forgiving her stepfather. She told him her stepfather was hugging her wrong, letting his hand brush against her breast. She also told Mr. Hodges she felt her stepfather’s penis touching her from behind.
Mr. Hodges told Christine they would have to confront her stepfather. Christine told Mr. Hodges she did not want the police involved. He stated *Supp. 27 that after talking with Christine, he prayed and sought advice. He did not know he was supposed to contact the police. Even more important, he did not contact the police because he believed that his role in the matter was a pastoral one, specifically dealing with Christine’s inability to forgive her stepfather. He did not believe the incidents described by Christine were “sexual abuse”; he believed they were sins. He stated he had to follow the Scriptures concerning disciplining a Christian.
Mr. Nobbs testified he is the assistant pastor of South Bay United Pentecostal Church. The major scope of his duties is to assist the pastor. He is the elder of the division of education. He is principal of the South Bay Christian Academy, responsible for the day-to-day operation of the school. He stated he discussed the situation with Mr. Hodges primarily in the context of his taking over Lyn M.’s ministerial duties. He stated Christine would have been able to attend school and graduate so long as she was living in harmony at home. If her parents had allowed her to live outside the family home, he would have no objections to her attending school and graduating. Her parents, however, wanted her home. He believed that when he received information concerning what had taken place between Christine and her stepfather, he was acting in a pastoral capacity as assistant pastor. Mr. Hodges told him there had been inappropriate touching by the stepfather. He knew no other details.
The jury found both appellants guilty as charged.
Issues
(1) Was there substantial evidence to support the convictions?
Appellants first contend they were not acting as “child care custodians” within the meaning of the statute. According to appellants, Mr. Hodges was counseling Christine, a member of the church with a spiritual problem, as the pastor of the church. Appellants argue most of the meetings were not during school hours. They also argue Mr. Nobbs was not acting as a child custodian, but rather was called to be informed that Christine’s stepfather would be relieved of his ministerial duties and Mr. Nobbs would have to assume them.
The jury was instructed on the definition of a child care custodian pursuant to section 11165.7: “ ‘[Cjhild care custodian’ means a teacher; . . . administrative officer, supervisor of child welfare and attendance ... of any public or private school.” No objection to this instruction was raised by any party.
*Supp. 28 The record reflects substantial evidence to support the jury’s finding that appellants were child care custodians. The school attended by the victim, South Bay Christian Academy, was operated by South Bay United Pentecostal Church. Both facilities shared the same building. While most students were members of the church, not all students were. Religious and academic classes were taught. Appellants were involved in running the school as president and principal (as well as holding pastoral positions with the church). Appellant Nobbs took care of the day-to-day management of the school while appellant Hodges had overall responsibility for decisions concerning the school. Hodges presented diplomas at graduation which were signed by both Hodges and Nobbs.
Christine testified she sought help from Hodges when she was age 17 regarding her stepfather’s continued molestation of her. She was excused from school early to see Hodges. A teacher made the appointment for her and Nobbs gave her permission to leave class early for the appointment. Hodges told Christine how he intended to handle the situation. Both appellants at one time told Christine if she did not move back home she would be unable to finish school and graduate. Christine testified she sought Hodges’s help because he was in charge of the school.
The court must accept the evidence in the light most favorable to the judgment, and the court must presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (.People v. Reilly (1970) 3 Cal.3d 421 [90 Cal.Rptr. 417, 475 P.2d 649].)
Here there is ample evidence to support the jury’s verdict and decision that when Christine sought help, appellants were acting in their capacity as child care custodians.
(2) Does the statute fail to provide adequate notice?
Appellants next contend the statute, section 11166, subdivision (a), violates due process as applied to them, as it fails to give adequate notice of the obligation to report. Appellants rely on Lambert v. California (1957) 355 U.S. 225 [2 L.Ed.2d 228, 78 S.Ct. 410]. In Lambert, a convicted felon was convicted of a Los Angeles Municipal Code ordinance which required any convicted felon to register with the chief of police within five days of arriving in Los Angeles. The question before the court was, “whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register, and where no showing is made of the probability of such knowledge.” (Id., at p. 227 [2 L.Ed.2d at p. 230].) The court held it did since the law did not provide an *Supp. 29 opportunity to either avoid the consequences of the law or to defend in any prosecution brought under it.
In considering whether a legislative proscription is sufficiently clear to satisfy the requirements of fair notice, we look first to the language of the statute, then to its legislative history, and finally to the California decisions construing the statutory language. The law requires citizens to apprise themselves not only of statutory language but also of legislative history, subsequent judicial construction and underlying legislative purpose. (Walker v. Superior Court (1988) 47 Cal.3d 112 [253 Cal.Rptr. 1, 763 P.2d 852].)
These principles suggest a legislative enactment must be upheld unless its unconstitutionality clearly, positively, and unmistakably appears on the face of the statute. A statute should be sufficiently certain that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be void for uncertainty if any reasonable and practical construction can be given to its language. (Walker v. Superior Court, supra, 47 Cal.3d 112.)
As respondent notes, the terms “child,” “child abuse,” and “child protective agency” are all defined in the Reporting Act, as is “child care custodian.” The definition of “child care custodian” includes “an administrative officer, supervisor of child welfare and attendance, or certificated pupil personnel employee of any public or private school.” (§ 11165.7.) The intent of the Reporting Act, as stated by the Legislature, is to protect children from abuse, including neglect, willful cruelty, or unjustifiable punishment and unlawful corporal punishment or injury.
The Legislature has been sufficiently definite in drafting the Reporting Act to give the constitutionally required degree of notice to those subject to its requirements.
Appellants also contend the statute as applied in this case is insufficiently specific given its impact on activities potentially subject to First Amendment protection. According to appellants, their right to free speech is compromised, since the statute compels appellants to speak what they do not wish to speak. Appellants argue they were obligated by the dictates of their faith and precepts stemming therefrom not to disclose to the community the contents of pastoral communications with Christine. Appellants’ faith requires that matters involving dissension with the families of the congregation be handled by the church. The statute, according to appellants, does not clearly manifest a legislative intent to extend the mandatory reporting requirement to religious personnel who are engaged in the operation of a school and who *Supp. 30 have not had training or education in the area of child abuse detection. Where a statute’s literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression and/or conduct sheltered by the First Amendment, the vagueness doctrine demands a greater degree of specificity than in other respects. (Smith v. Goguen (1974) 415 U.S. 566 [39 L.Ed.2d 605, 94 S.Ct. 1242].)
Appellants’ position is not persuasive. The statute is very carefully worded to inform any child care custodian (which is also very clearly defined) in any public or private school that he or she must report any incident of suspected child abuse. There was an obvious intent on the part of the Legislature not to create any exceptions to the reporting requirement. The statute is sufficiently specific to defeat a constitutional attack based on the vagueness doctrine. In any event, the evidence here established that appellants were aware of the law and were aware they were mandatory reporters under that law.
(3) Does the statute, as applied, violate the free exercise of religion clause or free speech clause?
Appellants next contend the statute, as applied in this case, violates the free exercise of religion clause of the United States Constitution. The First Amendment provides that Congress “shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.”
The United States Supreme Court has established certain principles for determining whether conduct rooted in religious belief is protected by the free exercise clause. The First Amendment guarantees two types of religious freedom: the freedom to believe and the freedom to act. It is well settled that the freedom to believe is absolute, while the freedom to act is not. (See Reynolds v. United States (1879) 98 U.S. 145 [25 L.Ed. 244] [polygamy convictions upheld]; Sherbert v. Verner (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790 upheld] [law conditioning unemployment benefits on willingness to work on petitioner’s religious day struck down].)
Interference with religion by government action may be either direct or indirect. Direct interference is rare and results when a government enacts legislation directed specifically at a religious practice. Indirect interference is more often the case, and it occurs when a facially neutral statute impacts a religious practice. General regulations having an otherwise valid object are not necessarily rendered invalid by reason of some incidental effect on religious beliefs or observances; a balancing test is employed. (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 376, p. 548.) *Supp. 31 Although a determination of what is a “religious” belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his or her own standards on matters of conduct in which society as a whole has important interests. (Wisconsin v. Yoder (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526].)
The issue, then, becomes whether appellants’ failing to report known child abuse as required by the statute and instead choosing to handle the problem within the church, even if motivated by sincere religious beliefs, is protected religious activity under the First Amendment.
In order to determine whether a statute unconstitutionally violates the free exercise clause, the United States Supreme Court requires analysis of the following three factors: (1) the magnitude of the statute’s impact upon the exercise of the religious belief; (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of religious belief; and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the statute. (Callahan v. Woods (1984) 736 F.2d 1269.) The burden of proof with respect to the first prong lies with plaintiff; if satisfied, the burden of proof with respect to the last two prongs shifts to defendant. (Callahan, supra, at pp. 1272-1275.)
Here, the trial court found the statute did impact on appellants’ sincerely held religious beliefs. However, the lower court also found that the statute fiirthered a compelling state interest—the possible impairment of the physical or mental health of children. In People ex rel. Eichenberger v. Stockton Pregnancy Control Medical Clinic, Inc. (1988) 203 Cal.App.3d 255 [249 Cal.Rptr. 762], the court was faced with the issue whether reporting consensual sexual conduct of minors would violate their right to privacy. The court found no constitutional violation stating, “We have no doubt that the reporting to a child protective agency of a suspected violation of subdivision (a) of section 288, a felony, serves both a compelling . . . and also significant state interest .... One compelling state interest is the apprehension of the perpetrator of a felony offense. A significant state interest not present in the case of an adult [where constitutional privacy rights are claimed] is the detection and prevention of child abuse.” (Id., at p. 241.)
Respondent relies on North Valley Baptist Church v. McMahon (E.D.Cal. 1988) 696 F.Supp. 518, as being factually similar to the case at bar. In North Valley, a religious group operating a preschool challenged the constitutionality of the California Child Care Facilities Act (Health & Saf. Code, *Supp. 32 § 1596.70 et seq.) By this act, the State Department of Social Services is authorized to establish, administer, and monitor a comprehensive program applicable to all day care centers. The act does not provide for distinctive treatment for religiously affiliated day care centers. The North Valley Baptist Church claimed it should be exempt from the act’s licensing scheme because to comply would interfere with its constitutional right to “ ‘minister to the needs of the people without interference from government.’ ” (North Valley, supra, 696 F. Supp. at p. 522.) In analyzing whether the act unconstitutionally interfered with the church’s right to free exercise of religion, the court first concluded that the licensure requirement did impose a substantial burden upon the plaintiff’s religious expression. However, in spite of this burden the court held: “According to its stated purpose, the licensing requirement of the Child Care Facilities Act is designed to protect the health and safety of children receiving care outside their home. Without hesitation, the court finds this to be a compelling state interest of the highest order.” (Id., at p. 526.)
Here, too, appellants claim the school is an integral part of their church ministry and to comply with the reporting statute would threaten substantial impairment of the exercise of the Pentecostal faith. The court in North Valley rejected that argument, as does this court. The statute in no way infringes on appellants’ religious practice when they are acting solely in the capacity of pastors. However, when, as here, a student seeks assistance from them as administrators of the school, their obligation under the statute arises. While the distinction between the two positions may not always be clear, given the compelling state interest served by the Reporting Act, if the information comes to a teacher/principal/clergyman in any way through the school setting, reporting is mandatory. The compelling state interest furthered by the reporting statute, protecting children from child abuse, justifies any burden on appellants’ religious practice.
The mere fact that a petitioner’s religious practice is burdened by a governmental program does not mean an exception accommodating that practice must be granted. The state may justify an inroad on religious liberty by showing it is the least restrictive means of achieving some compelling state interest. (Thomas v. Review Bd., Ind. Empl. Sec. Div. (1981) 450 U.S. 707 [67 L.Ed.2d 624, 101 S.Ct. 1425].)
Here, if appellants are held to be exempt from the mandatory requirements of the Reporting Act, the act’s purpose would be severely undermined. There is no indication teachers and administrators of religious schools would *Supp. 33 voluntarily report known or suspected child abuse. Children in those schools would not be protected. The protection of all children cannot be achieved in any other way.
Appellants also contend that the statute impermissibly infringes on their First Amendment right to free speech in that the statute compels speech and is a content-based regulation. Respondent notes this objection was not raised in the court below, but also argues the same analysis given to the free exercise challenge must be applied to this free speech challenge—does the compelling state interest in the protection of children from abuse override the burden imposed on appellants’ right to free speech? This court concludes it does; there is no other less intrusive way to satisfy the act.
(4) Does the statute, as applied, violate the establishment clause of the First Amendment?
To survive an establishment of religion clause challenge, a statute must have a secular purpose, neither advance nor inhibit religion as its principal or primary effect, and not produce excessive governmental entanglement with religion. (Lemon v. Kurtzman (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105].)
Appellants argue the Reporting Act constitutes excessive governmental entanglement with religion. According to appellants, the court, by refusing instructions that appellants at all times were acting as clergy and not as child care custodians, took upon itself to define what is religious and what is secular among the varied activities of a pastor. The court, in effect, determined the activities of clergyman and child care custodians, in a church-operated school, are mutually exclusive. The court, in effect, has barred a pastor from religious counseling of suspected child abuse among the members of his or her congregation, thus interfering substantially with the pastoral role of its ministers.
The comprehensive reporting requirement is designed to ensure the health and safety of children and fulfills a vital and appropriate secular purpose. In Prince v. Massachusetts (1944) 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438], the court stated, “The right to practice religion freely does not include liberty to expose the community or the child to communicable diseases or the latter to ill health or death.” {Id., at pp. 166-167 [88 L.Ed. at pp. 650-653].)
As respondent notes, religious freedom is not absolute. Religious organizations engage in various activities such as founding colonies and operating libraries, schools, wineries, hospitals, farms and industrial and other com *Supp. 34 mercial enterprises. Conceivably they may engage in any worldly activity, but it does not follow that they may do so as specially privileged groups, free of the regulations that others must observe. If they were given such freedom, the direct consequences of their activities would be a diminution of the state’s power to protect the public health and safety and the general welfare. (Gospel Army v. City of Los Angeles (1945) 27 Cal.2d 232 [163 P.2d 704].)
The act is limited in its intrusiveness and does not create an entanglement concern. The state has a legitimate interest in the health and safety of its children. The act mandates that certain persons, including teachers and administrators of private schools report known or suspected child abuse. The compelling state interest furthered by the act justifies the interference with appellants’ religious practices when appellants are acting in the capacity of child care custodians within the meaning of the statute.
Thus, we find there was substantial evidence to support appellants’ convictions. We also hold the statute, under the facts of this case, does not violate any of appellants’ constitutional freedoms or rights. For these reasons, the judgment of the lower court is hereby affirmed.
Tobin, J., and Murphy J., concurred.

All further statutory references are to the Penal Code unless otherwise indicated.