[No. G026457. Fourth Dist., Div. Three. Sept. 22, 2003.]

STEVEN F. et al., Plaintiffs and Respondents, v.
ANAHEIM UNION HIGH SCHOOL DISTRICT, Defendant and Appellant.

COUNSEL

Farmer, Murphy, Smith & Alliston, George E. Murphy, Suzanne M. Nicholson; Lynberg & Watkins and Ric C. Ottaianno for Defendant and Appellant.

Law Office of Robert W. Scott and Robert W. Scott for Plaintiffs and Respondents.

OPINION

SILLS, P. J.—

I

This case deals with the claims of the *relatives* of an injured person to recover for their own emotional distress occasioned by an injury that they did *not* witness and which the victim actively tried to conceal from them. Specifically, two parents have sued the Anaheim Union High School District for emotional distress when they discovered that their daughter, who had just completed the 11th grade, had been engaged in a sexual relationship with one of her teachers since early in the 10th grade (and who had touched her sexually before that).

The teacher went to jail. In the civil case against the district, the jury assessed total damages of more than $3 million, of which $640,000 was apportioned to the parents.

The district has appealed. While this appeal was pending all claims *by the student* against the district were settled. We deal here only with the parents' claims against the district.

The discovery of the sexual relationship occurred in June 1997, when the student's mother found a hidden collection of sexually explicit letters from the teacher that had been hidden in the daughter's closet. The mother confronted her daughter about the letters and the sexual relationship with the teacher was exposed. The student begged her mother not to go to the police, but to no avail. The teacher was arrested. The student became suicidal and the relationship with her parents deteriorated.

The student herself would later testify that she went to "great lengths" to conceal her relationship with the teacher, and told no one about it, though she had marked her calendar with a red heart for each sexual incident. Her friends testified that it never crossed their minds that the teacher was molesting her,

or that she was anything other than "a teacher's pet" to him, or that he was more than a "grandfather figure" to her. Though the record is large, there is no evidence that any other district teacher or supervisory employee actually knew of the *sexual* relationship.[1] There is, however, evidence of obliviousness—perhaps the better word would be cluelessness—on the part of several of the district's teachers (as distinct from supervisors), who, had they been inclined to be suspicious about a student who was always hanging around her teacher, might have put two and two together and surmised that the relationship between the student and the teacher was not platonic.[2]

---

[1] Here are the two strongest items of evidence bearing on the knowledge of fellow *teachers* about the relationship. One, the student testified that she saw a teacher, a Ms. A., walk by a van at a time when she was having sex with her teacher. The van had windows, though there was no testimony that the windows were particularly easy to see *into*. The student was in back, on the floor, when she saw Ms. A. walk by. (The parent's brief overstates this incident considerably when it declares, at page 18, that Ms. A., "looked directly at Defendant-teacher when he was having sex with minor student in his van." The record references do not bear out that characterization.)

Two, during a summer session, the student and the teacher were in his class and "one of the boys" asked who the student was. The teacher's reply was that she was his "girlfriend." Another teacher who was also in the room smiled and made a comment not otherwise disclosed in the record.

[2] At page 18 of the parents' brief, under the heading of "Constructive Notice" to the district of the teacher's wrongful conduct, there is a listing of items. One of those items we have already covered in footnote 1. Other items involve similar distortions of the record. We quote from the brief then point out what the record really said.

"(a) During the Yosemite trip, AUHSD supervisors never cautioned Defendant-teacher about leaving the campsite alone with minor student at night but joked about it instead. (RT 522, 524, 525–529]."

There is no evidence that the two other adults on the trip were "supervisors" in the sense of having administrative positions in the district. They were cross-country coaches. What happened is that the student asked one of her friends to accompany her to the showers, the friend refused to go, the teacher volunteered, and one of the cross-country coaches made a comment in a joking manner, "oh, you guys are going to the shower together?" The fact that the statement was made, but made in a joking manner, indicates that the cross-country teacher was only pointing out, in a friendly way, the appearance of impropriety. Yet it was dark, and it was clear *someone* had to accompany the student. There was far more danger in letting a student wander off by herself in a wilderness area than in having a male teacher accompany her.

(b) "Defendant-teacher used minor-student's history teacher to pass her the pornographic letter (RT 482–483) in Exhibit 13 which was read to the jury. (RT 588)."

The lurid pornographic fantasy letter read into the record from pages 481 through 487 of the reporter's transcript was handed to the student by the teacher directly. ("Q. He handed it to you right there at the school? A. Yes.") The teacher gave another letter, the one referred to at page 588 of the reporter's transcript, to a history teacher to give to the student. That letter, read into the record at pages 580 through 582, is not pornographic. It is a series of time entries centered around the teacher's anxiety for a phone call from the student (e.g., "11:30 No Call. [¶] 2:30. Up, no sleep. Is she okay? . . ."). Parts of the letter are in code or allude to personal codes, such as "A" for the teacher's wife, and an allusion to a convention where the student was to call the teacher's house but only ring once. *That* letter, if read closely, would alert the reader to

## II

■ In *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438 [56 Cal.Rptr. 766, 769 P.2d 948], our Supreme Court held that a school district

a probable sexual relationship between the teacher and the student. And while it might have been read (because it was not in an envelope) there was no evidence that it *was* read. The teacher who served as relay was not called as a witness.

(c) "Defendant-teacher had minor-student's failing grade in history changed to passing by this same teacher. (RT 592–594)."

This is correct. The student testified that the teacher told her that he talked to the history teacher and "took care of" changing a grade from a "D" or "F" to a "C."

(d) "AUHSD teacher Ms. A[ . . . ] looked directly at Defendant-teacher when he was having sex with minor student in his van in the AUHSD parking lot and didn't report it. (RT 493, 496)."

We have already discussed this item of evidence above. There is no evidence that Ms. A. saw anything *in* the van.

(e) "He frequently sent minor student flower grams signed 'Love S[ . . . ]' thru an AUHSD teacher. (RT 912–921)."

Four times a year school cheerleaders sold "flower grams" in which they would take orders (and money) and a flower would be delivered to a second period class, where the teacher would give the flower to the student. The teacher here sent the student a "flower gram" a number of times, requiring the second-period teacher to read "at least" her name to give it to her.

(f) "He left a red rose for her with a note signed 'Love S[ . . . ]' with the AUHSD office secretary where minor student was working. (RT 910–912)"

While the student was working as an office assistant in the principal's office, the teacher brought a red rose with a flower card tied to the vase, to the office, and gave it to a "staff person" (the secretary) to give to the student.

(g) "When [a fellow teacher who was a track coach] saw Defendant-teacher give minor student the Victoria Secrets Gift certificate, he said he wanted to see what Defendant-teacher would give her for her 18th birthday. (RT 813–814, 1030–1031)"

For the student's 17th birthday, she and two friends, and the teacher and the track coach, gathered in the teacher's room for a small birthday party in the morning before class. The student received three presents, gift-wrapped: a beach blanket, some lotion, and a $50 gift certificate to Victoria's Secret. The track coach remarked at the end of the gift giving, "Gee, [S . . . ], what are you going to give her for her 18th birthday?"

(h) "At least 11 different teachers, including the principal, saw Defendant-teacher drive minor student away from the school campus during the three years he was molesting her but no one reported him. (RT 1173–1176) AUHSD policy *prohibited teachers from driving students in their cars*. (RT 1207–1209; 1262; 1276)"

The cited record references show that a female science teacher and track coach (the other teacher who had been on the Yosemite trip) testified that it was "not advised" for teachers to drive students in their cars. ("They advise us not to do it. They would prefer that we do not do it.") Later she acknowledged that the athletic director had an "understanding" that teachers "are not supposed to give students a ride home from school or any place." This track coach saw the student and teacher get into the teacher's vehicle (she thought it was a station wagon of some sort, not a van). A teacher from a junior high school, however, admitted on cross-examination that "there is an absolute rule in Anaheim Union School District that students are not to be in teacher's cars." This junior high teacher saw the teacher and the student in the teacher's vehicle twice. However, a few pages later this same junior high teacher testified that it was only a "general policy" and he himself had driven students home when there was a necessity for it. ("I've driven students home. The district general policy is not to do that, but I have done

cannot be held *vicariously* liable for a teacher's sexual misbehavior with a student. (There a junior high mathematics teacher pressured a 14 year old student into sexual acts.)[3] The only way a school district may be held liable must be "premised on its own direct negligence in hiring and supervising the teacher." (*Id.* at p. 453; see also *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1057 [5 Cal.Rptr.2d 777] ["*John R.* makes it clear that a teacher's sexual abuse of a child is not an act for which a school district may be held responsible. The District can be held liable only for its *own* conduct which causes injury." (Italics added.)].)

There was absolutely no evidence at all in this case that the school district was negligent in *hiring* the teacher or in continuing to employ him. (Cf. *Virginia G. v. ABC Unified School District* (1993) 15 Cal.App.4th 1848 [19 Cal.Rptr.2d 671] [allowing for liability if employees responsible for hiring or supervising teachers knew of teacher's prior sexual misconduct with students].) The student here kept the relationship with the teacher secret from even her closest friends. She complained to no one, including her parents or any school officials. Nor is there any evidence that the district had knowledge of any prior pedophiliac or other tendency on the teacher's part to try to have sex with his students.

This case thus presents a direct contrast to *Ortega, supra,* 64 Cal.App.4th 1023. In *Ortega,* the miscreant teacher was accused of fondling young girls when he was an intern with the school district and was criminally prosecuted for it, though acquitted. Four years later he was the target of complaints that he touched female students inappropriately (including touching a girl's breast) during after-school athletic events, and allowed his attorney to literally walk away with any documentation of those complaints. No wonder that when, years later, the district was being sued for the molestation of two female

that. There are some situations where I have felt it was necessary to take the student home.") He gave some examples, including a student taking a make-up test after school and it was raining, or if the mother was sick in bed, or a student who got very ill after school and had no way to get home. And while most of the time he would talk to the parent, in the case of the very ill student he didn't.

The principal testified that it was a "policy" at the high school that "teachers should not leave campus with a student alone" on "unrelated school activity." Though the policy was not in writing, it was "well-known professionally that this was not a good idea." The information, however, was "well-known" from the courses teachers would take in college to become credentialed, as distinct from being a formal rule conveyed to them by the district itself.

[3] While there are four separate opinions in *John R.*, a majority of five justices agreed that respondeat superior should not be applied to the case. The reason for the fragmentation is that there was a four-three split on the question of whether the plaintiff should be excused from the requirement of timely filing a tort claim with the school district. The lead opinion of two justices expressed the majority view on both the tort claim issue (with the majority saying it *was* excused) and the respondeat superior issue (with the majority saying it shouldn't apply).

students, the district made no attempt to argue to the appellate court that findings of negligent supervision and hiring were unwarranted. (*Id.* at p. 1055, fn. 19.)

*Ortega,* however, can shed no light on two issues which it didn't address. The first issue is whether the school *district* can be liable for negligent supervision where *it* has no knowledge of prior incidents which would prompt it to give greater scrutiny to a particular behavior. There was enough in *Ortega* to give the district warning (parental complaints within a few years of an actual prosecution for child molestation) that the teacher might pose a potential danger to female students. (The *Ortega* opinion, however, does not explore the comparatively harder question of what precisely the school district should have done after the teacher was acquitted for the first incident and was given a stern memo—perhaps analogous to a private reprimand in the legal profession—for the second. Fire him based on the second set of complaints? Then again, there was no need for the *Ortega* court to do so—as we just noted, the school district chose not to present the issue.)

The second issue unaddressed in *Ortega* was whether the parents of a molested student can recover for their own ensuing emotional distress *even if* there was negligent supervision. That issue was not before the court either. *Ortega* essentially is a long government tort claims estoppel case. Almost the entire discussion section of the opinion (pages 1043 through 1056 of the official reporter) centers on whether the district was estopped to assert government tort claims defenses (on that point the decision was split—the court said the district was estopped as to one student but not the other). The closest is one of the two issues which appear toward the end of the opinion, excessive damages. In the latter we learn that the father of the one student whose claims were allowed to survive was awarded $12,500, which turned out to be the cost of the tuition he paid when, in response to the reaction she received when she complained, he took his daughter out of the school and put her in a private school. (See *Ortega, supra,* 64 Cal.App.4th at p. 1060.) There is no indication that he was awarded non-economic damages for emotional distress. (The other issue was comparative fault. The jury thought the district was 100 percent at fault, and assigned no fault to the teacher. That was obviously untenable and the appellate court so held.)

### III

For purposes of this opinion, we will assume, for sake of argument, that the Anaheim Union High School District negligently supervised the teacher, and the negligent supervision allowed the sexual relationship between the teacher to begin, or at least to continue on. We stress, however, that in no way should this opinion be read for any such proposition. There is much in

this record that stands against it. We only make the assumption in order to underscore the inability of the student's *parents* to recover for *their own* emotional distress when the relationship came to light.

In *Martin By and Through Martin v. United States* (9th Cir. 1993) 984 F.2d 1033, Judge Rymer collected and explained the various California authorities bearing on third party emotional distress, beginning with *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813]. The necessity to do so was borne of a case the facts of which were easily more egregious than the one before us. In *Martin*, a six year old girl was enrolled in a day care center run by the federal government, hence the United States in the title of the case. The children at the day care center were taken on an outing to a park, under the supervision of an employee. The six year old girl became separated from the group as a result of the employee's negligence. She was abducted and raped. The sister was present at the police station when the six year old was brought in. Both the mother and the sister ended up suing the United States for their own emotional distress, negligently inflicted as a result of the six year old's injuries. That prompted the Ninth Circuit to provide a nice summary of California law on the matter.

First, any recovery for the "negligent infliction of emotional distress" on the part of third party relatives requires that the plaintiff either be a bystander or direct victim. "Bystander duty," the court noted, is only recognized when the bystander is closely related to the victim, is "present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim," and suffers emotional distress beyond what would be "anticipated in a disinterested witness." (*Martin, supra,* 984 F.2d at p. 1037, citing *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197], which in turn was quoting *Thing v. La Chusa* (1989) 48 Cal.3d 644, 647 [257 Cal.Rptr. 865, 771 P.2d 814].) In *Martin*, not even the sister could recover against the negligent day care center as a bystander, because her *awareness* of her sibling's injury only "came as a consequence of, not as a concomitant to," the negligent supervision. (*Martin, supra,* 984 F.2d at p. 1038.)

We need only add at this juncture that by the same rule the parents in the case before us cannot recover as bystanders either. As in *Martin*, their emotional distress is only a consequence of the sexual relationship their daughter had, and was not concomitant to it. (Accord, *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 522 [150 Cal.Rptr. 1, 585 P.2d 851] [mother could not recover for loss of comfort and society of student injured in a public intersection when he should have been in school because there was no sensory and contemporaneous observance of accident].)

The other basis for recovery is if the relative can be considered a "direct victim." *Martin* noted that the Supreme Court cases which have allowed relatives to recover as direct victims (*Christensen v. Superior Court* (1991) 54 Cal.3d 868 [2 Cal.Rptr.2d 79, 820 P.2d 181]; *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278]; and *Molien v. Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916) each involved negligence which was "directed at" the relative as well as the injured party. (*Martin, supra,* 984 F.2d at p. 1036.) In one of the clearest passages one finds in this area of the law, the *Martin* court noted that *Christensen* involved funeral services, whose primary beneficiaries are the living relatives "for whose benefit the funeral or related services take place," *Marlene F.* concerned a psychotherapist who was treating both parent and child for relationship problems, and *Molien* was a case where the negligent doctor acted affirmatively to have a diagnosis of syphilis communicated—as it turned out it was a *mis*diagnosis—to a patient's spouse. (*Martin, supra,* 984 F.2d at p. 1036.)

The *Martin* court thus held that the mother of the six year old child could not recover from the day care center. The negligent supervision was not "directed at" the mother. Again, the same thing applies in the case before us now. ■ Assuming that there was any negligent supervision of the teacher here (as we said, a very tenuous assumption indeed) it was at the most directed at not noticing the rather too-close relationship between the student and the teacher, not directed at the parents. *Martin,* in fact, would apply a fortiori in this situation because surely there is more of a direct duty to the parent of a six year old who specifically enrolled her in a day care center to keep her from getting lost on an outing than there is to the parents of a teenager in a public high school to prevent a relationship that the teenager herself was trying to hide.

## IV

An alternative model of recovery for emotional distress on the part of relatives has been proffered by our colleagues in Division Two in this District in *Bro v. Glaser* (1994) 22 Cal.App.4th 1398 [27 Cal.Rptr.2d 894]. If *Martin* provides a brief summary of the law in the area, *Bro* offers an exhaustive one. (Parts of the opinion read as if they were from an A.L.R. annotation, e.g., *Bro, supra,* 22 Cal.App.4th at pp. 1432–1437 [describing cases allowing, and not allowing, "non-adjunct claims for emotional distress"].) After a very comprehensive discussion of the authorities, *Bro* offered the simplest of models: There must be outrageous conduct on the part of the defendant for the relative to recover. (See *Bro, supra,* 22 Cal.App.4th at p. 1441.) Thus in *Bro,* the fact that an obstetrician nicked the cheek of a baby in the process of a caesarean section causing no permanent injury to the baby and thereby

marred the "presentation" of the baby to the parents did not rise to a "sufficient level of outrage" to support emotional distress recovery. (*Id.* at p. 1443.)

The result must also be the same here under the *Bro* model.[4] The teacher's sexual obsession with the student may have been outrageous, but the fact that his fellow teachers weren't sufficient busybodies to report him to district authorities by no means comes close to outrageousness. Teachers are independent professionals who generally work alone (maybe school assemblies and playground supervision are exceptions). That fact applies all the more so for high school teachers. They are independent professionals who do their work alone in classrooms. They are not security guards, or morals police. Being clueless as to the implications of one student spending too much time in the company of a teacher is not outrageous behavior at all, especially when that student is trying to conceal the sexual nature of the relationship from even her close friends.[5]

---

[4] In saying this, let us hasten to add we are not persuaded that *Bro's* model is the correct one, or would be adopted by our Supreme Court at such time as it might attempt, as we speculated in *Lawson v. Management Activities, Inc.* (1999) 69 Cal.App.4th 652, 655 [81 Cal.Rptr.2d 745], to articulate "one grand unified theory" for emotional distress cases. As noted by Justice Janice Rogers Brown, then of the appellate court, "The *Bro* test strays from the guidelines established by the Supreme Court and places too great a reliance on one particular element of the general negligence principles which govern imposition of liability." (*Mercado v. Leong* (1996) 43 Cal.App.4th 317, 327 [50 Cal.Rptr.2d 569].) Our discussion now of the *Bro* "outrageous test" is merely illustrative. *Bro* is a convenient jumping off point to emphasize that here there is only a tenuous link between the whatever it was that the district may have done wrong and the parents' subsequent emotional injury. (Cf. *Mercado, supra*, 43 Cal.App.4th at p. 326 ["The pivotal issue of policy is whether the emotional injury flows naturally from acts invading an established duty in tort."].)

[5] The Child and Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.), often known as the mandated reporter law, is not triggered until the mandated reporter has, at the very least, *reasonable* suspicion of child abuse or neglect as defined by the statute. (See Pen. Code, § 11166, subd. (a) ["a mandated reporter shall make a report to an agency specified . . . whenever the mandate reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse"].) Nothing we say in this opinion is intended to minimize that statutory duty.

In *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1086–1087 [60 Cal.Rptr.2d 263, 929 P.2d 582], our high court found it unnecessary to determine whether a complaint's allegations were sufficient to allege that certain school district officials had a duty to report under the mandated reporter law. That case came to the high court on demurrer, and there, in contrast to the case before us, the complaint alleged that the officials actually knew of "prior improper contacts with female students," knew of "various parents' complaints" about the teacher's prior sexual misconduct, and even knew of "disciplinary actions taken" against the teacher for sexual harassment of female students which had led to a resignation by the teacher. (*Id.* at pp. 1071–1072.) Here, it is enough to note that there were no specific complaints to anyone, teacher or administrator (cf. *People v. Hodges* (1992) 10 Cal.App.4th Supp. 20 [13 Cal.Rptr.2d 412] [student complained of abuse by stepfather to head of private religious high school who did not report, she later reported molestation herself to police]);

## V

The parents rely primarily on one case, *Phyllis P. v. Superior Court* (1986) 183 Cal.App.3d 1193 [228 Cal.Rptr. 776]. *Phyllis P.* did indeed allow a parent to recover after a daughter was raped by a fellow student. The case is, however, distinguishable from the present one in no less than three major ways.

First, there was warning of propensity on the part of the 13 year old student who committed the rape. Before the rape giving rise to the litigation, he had "sexually molested" the eight year old victim "a number of times" both on the way to school and on school premises. (See *Phyllis P., supra,* 183 Cal.App.3d at p. 1195.) In the present case, as we have pointed out, it is undisputed that there were no prior incidents giving any warning of any tendency on the part of the teacher to engage in sexual acts with his students.

Second, in *Phyllis P.* there was clear knowledge of the danger on the part of the school, including its management. The victim reported the fact that she was being molested by the 13 year old to her teacher. (*Phyllis P., supra,* 183 Cal.App.3d at p. 1195.) The teacher in turn consulted with the school psychologist about it. Later the school principal learned of the molestations and called the 13 year old into his office. In the present case, by contrast, there was no unambiguous knowledge of danger on the part of any teacher, much less a district manager such as the school principal. At most a small handful of teachers who might have observed the student and teacher here being too close too often didn't put two and two together and go to anyone in district management. But then, neither did the student's friends or her parents.

Third, in *Phyllis P.* there was a conscious decision to preempt the parents from learning of the possibility of danger once it was known. Neither the teacher, the counselor nor the principal informed the parent of the potential danger to her daughter, and in fact the school principal tried to use the *threat*

confessions (cf. *People v. Younghanz* (1984) 156 Cal.App.3d 811 [202 Cal.Rptr. 907] [father confessed molestation of daughter to student counselor at college clinic]), or objective physical evidence which might give rise to a reasonable suspicion of abuse (cf. *People v. Salinas* (1982) 131 Cal.App.3d 925, 930–931 [182 Cal.Rptr. 683] [emergency room physician saw child bruised and unconscious, and was given story by parent that was not consistent with injuries]). Given the absence here of any actual knowledge of abuse or of any objective facts not also compatible with an innocent explanation (in contrast with *Salinas*), our case is more like *John R., supra,* 48 Cal.3d 438 [256 Cal.Rptr. 766, 769 P.2d 948]. If, in *John R.,* our high court was not willing to indulge the "unduly pessimistic view of human nature" that assumes there will be a sexual misconduct "any time a minor and an adult are alone in a room together," in the context of a civil law tort foreseeability analysis (*id.* at p. 450, fn. 9), a fortiori something more is needed for *reasonable* suspicion as the words are used in the penal statute. After all, the mandated reporter law does not go so far as to impose "investigative duties on its agents." (See *People v. Younghanz, supra,* 156 Cal.App.3d at p. 818.)

of notification to his parents—not his victim's mother—to deter the 13 year old from further molestations. (*Phyllis P., supra*, 183 Cal.App.3d at p. 1195.) Thus it made sense for the court, in its concluding paragraphs, to say— though it did so without a great deal of elaboration—that the parent was a "direct victim" of the school's failure to act, and cite generally to *Molien v. Kaiser Foundation Hospitals, supra*, 27 Cal.3d 916.

In the present case, of course, there was no preemption or usurpation of the parental prerogative to take measures to protect the child. District officials made no conscious decision not to inform the parents of the relationship between the teacher and the student.

*Phyllis P.* was decided in 1986, so the court did not have the benefit of the *Burgess-Christensen-Marlene F.-Ortega* cases from our high court in subsequent years which have considerably explicated the law of relative recovery since *Molien*. It bears noting, though, that *Phyllis P.* relied on *Molien* primarily for a "forseeability test." (*Phyllis P., supra*, 183 Cal.App.3d at p. 1197.) That foreseeability test, however, has since been specifically repudiated by our high court in *Burgess*, which limited *Molien* to its facts. (See *Burgess, supra*, 2 Cal.4th at p. 1074.)

While *Phyllis P.* was decided on the now-repudiated simple foreseeability test articulated in *Molien*, the result in the case is still nonetheless explainable in terms of two ideas which have found support in subsequent cases. First, the decision by school officials not to inform the parent of the danger posed by the 13 year old was clearly a decision "directed at" the parent, not the student. Second, there is a sense of outrageousness in that decision which also makes it explainable under *Bro's'* model. The school officials in *Phyllis P.* were *deliberately* usurping the parental prerogative to protect the child.

Neither idea, however, applies in the case before us now.

## VI

Finally, any decision regarding liability to relatives can be tested using the traditional seven factors bearing on the existence of duty set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]. In *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1092–1095 [107 Cal.Rptr.2d 801], for example, the court applied the *Rowland* factors as a kind of test to ascertain the correctness of its earlier determination that parents holding a party for teenagers had no duty to prevent sexual assault by a 16 year old against a 13 year old. (See also *Lawson v. Management Activities, Inc., supra*, 69 Cal.App.4th at p. 657 [eschewing "mechanistic inquiry" and analyzing emotional distress "in light of the seven factors traditionally used by our Supreme Court to determine the existence of a duty"].)

Factor one: Foreseeability of harm. In *Romero*, the court noted that there was no evidence the parents holding the party were "aware of any facts" sufficient to put a reasonable person on notice that the 16 year old had a "long history of misconduct at school." (*Romero, supra*, 89 Cal.App.4th at p. 1092.) Here, the district was not aware of any facts which would lead anyone to conclude that the teacher here posed a threat to his students generally. Any foreseeability to the *district* based on the student and teacher seeming too familiar with each other in the eyes of nonsupervisory employees is attenuated to the point of unreasonability.

*Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73] is dispositive on the point. In *Chaney*, an action for negligent supervision was brought against a woman whose husband sexually assaulted a minor whom the wife invited into the home. The alleged abuse spanned eight years during which time the minor claimed that the husband paid " 'excessive attention' " to her, and was " 'excessive' in his gift giving." (*Id.* at p. 156.) The minor theorized that the wife's negligence "consisted of failing to recognize these 'signs' as indicative of the *possibility* that her husband was sexually molesting [the minor] which caused her to fail to investigate the situation." (*Id.* at pp. 156–157, italics in original.) The minor's theory of negligence suggested that the wife had a duty to investigate, i.e., "to examine every aspect of her husband's behavior to determine whether he is exhibiting signs indicating that he is contemplating molesting [a] minor." (*Id.* at p. 158.) The court very simply stated there is no such duty. (*Ibid.*) To the same effect is *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 514 [118 Cal.Rptr. 741], where the court refused to impose a duty on a landlord to prevent a dog attack "without proof that he knew of the dog and its dangerous propensities."

Factor two: Degree of certainty that plaintiff suffered harm. This factor here is weaker than the factor in *Romero*, where the court was only concerned with the injury to the 13 year old. That is because we are dealing here with the proposed liability of the district *to the parents*. To be sure, the parents clearly suffered emotional distress, but that distress was vicarious and wholly psychological.

Factor three: Closeness of the connection between the defendant's conduct and the plaintiff's injury. As with factor one, any liability rests on a highly attenuated relationship. Consider the intervening steps: (1) Some teachers observe a student and teacher paying excessive attention to one another in ambiguous circumstances, which are consistent with both a legitimate and a sexual relationship. (2) They fail to tell the district officials. (3) The district therefore never intervenes. (4) Meanwhile, the student does not tell her parents, leaving it up to chance for them to discover the relationship, and that only because the student keeps his amorous writings to her, but hides them in

the closet. *Only then* does (5) the truth come out which causes (6) the parents' emotional distress, which is itself prompted in part by the fact that their daughter had chosen to keep the relationship a secret from them.

Factor four: Moral blame. This factor strongly disfavors any liability here. There is no question that the district has done its part *generally* to prevent misconduct of the kind that went on here. The district conducts ongoing awareness programs on issues of sexual harassment, abuse and "appropriate" interaction with students. The yearly training sessions were augmented with updates, handouts and guidelines in the Teachers Handbook. Even the parents' brief acknowledges the "extensive training" of the teachers in that regard, so much so that a minor theme is not the district's teacher's were ill-trained, but that they must have all entered into a conspiracy of silence because they knew they were in *violation* of the district's policies. That argument itself is easily disposed of (it assumes its premise that teachers were consciously aware of sexual misconduct as distinct from merely not assuming the worst based on ambiguous facts), but it does illustrate the tenuousness between any lack of action by the district and the injury to the parents. Neither the district nor its teachers can be morally blameworthy for not assuming the worst about the relationship. In fact, our Supreme Court in *John R.* specifically rejected the "unduly pessimistic view of human nature" which holds "that sexual misconduct is foreseeable any time a minor and an adult are alone in a room together, at least if not constrained by the possibility of being interrupted." (*John R., supra*, 48 Cal.3d at p. 450, fn. 9.)[6]

*Federico v. Superior Court* (1997) 59 Cal.App.4th 1207 [69 Cal.Rptr.2d 370] likewise supports our conclusion on this factor—doing nothing about *ambiguous* conduct which, in hindsight, confirms evil suspicions is not worthy of moral opprobrium. Some people actually think well of their colleagues and will assume the best if the evidence is ambiguous.

In *Federico*, a hairstylist college hired a training supervisor who had "a history of illegal homosexual conduct with male minors." (*Frederico, supra*, 59 Cal.App.4th at p. 1214.) The college was sued when the supervisor took the son of one of its female students on a Sunday outing, during which the son was molested. It later came to light that the supervisor had touched some of the other children of the college's students "in a manner which in hindsight" could have been "interpreted as inappropriate or indicative" of the supervisor's "deviant sexual proclivities." (*Id.* at p. 1216.) The touching, however, was not overtly sexual: It consisted of "such occurrences as an unusually prolonged handshake, an overly friendly pat on the shoulder, or, on one occasion [the supervisor] having a younger child sit in his lap." (*Ibid.*)

---

[6] See also our comments in footnote 5, *ante*, concerning why the mandated reporter law does not apply to this case.

The court noted that the conduct was "ambiguous at worst" and "did not result in any complaints" to the college by the children or the parents. (*Ibid.*) The *Federico* court thus ultimately upheld a summary judgment. (*Id.* at p. 1214.)

Factor five: Policy of preventing future harm. *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275 [176 Cal.Rptr. 809] is instructive. There, a student sued a university when she was injured after two fellow students had been drinking and engaged in a speeding contest in which she was injured. The court held that the policy of preventing future harm was not a very strong one under the facts, because the university officials had not "collaborated" to encourage the drinking, and there was no "direct involvement" by the university in furnishing alcoholic beverages. (*Id.* at p. 290.) In the case before us there certainly was no collaboration either.

The case before us is not one of those cases where the installation of a five-cent part in a car can save a life in a rear-end collision. Rather, as in *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300 [85 Cal.Rptr.2d 768], the cost of implementation of any policy of prevention would be more than the policy was worth. Under our facts here, a policy of prevention of this sort of harm would require turning the culture at every high school in the district into a virtual police state, with fellow teachers being required to report mere *suspicions* of what would no doubt be called "inappropriate fraternization."

Factor six: The burden on the district. As we have just mentioned, the burden on a school district of preventing relationships *beyond what it is already doing* would be intolerable. It would be a reign of terror. Let us elaborate further. Teachers would be forced to be spies on their fellow teachers, with pain of discipline if they didn't. Mandatory tattling. Student-teacher camaraderie would not only suffer, but would have to be virtually outlawed. No hugging, ever. No being in the same room alone, ever. No unchaperoned rides in a teacher's car, ever. No gifts, ever. Policies or guidelines counseling teachers not to give rides to students would be made absolute, without allowance for the possibility of human compassion, sickness, or rain. From the point of view of students and teachers the rule would be: Assume the worst. Any possibility of student-teacher friendship would be sacrificed on the altar of risk aversion.

Factor Seven: Consequences to the community for imposing a duty to exercise the care required to prevent the injury. In this case, intolerable.

Additionally, sexual relationships are not the sort of thing that insurers can indemnify with only a marginal increase in premiums. Insurers do everything

they can to avoid any indemnity for sexual acts. Thus all liability would come out of the district's own pockets, and the real victims would be students and taxpayers.

As should be clear, the *Rowland* factors decidedly disfavor any duty here.

## VII

The judgment is reversed insofar as the parents are concerned, with instructions that a new judgment be entered that they take nothing by way of their claims. Each side will bear its own costs on this appeal.

Rylaarsdam, J., and O'Leary, J., concurred.

A petition for a rehearing was denied October 22, 2003, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 14, 2004. Kennard, J., was of the opinion that the petition should be granted.