NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JENNIFER ANN GRIFFITH, *Appellant.*

No. 1 CA-CR 14-0297

FILED 8-20-2015

Appeal from the Superior Court in Maricopa County
No.  CR2013-00377-001
The Honorable Rosa Mroz, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Ballecer & Segal, LLP, Phoenix
By Natalee Segal
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Kent E. Cattani and Judge Lawrence F. Winthrop joined.

---

**S W A N N**, Judge:

**¶1**        Jennifer Griffith appeals her convictions and sentences for second-degree murder and abandonment or concealment of a dead body.

**¶2**        This case comes to us as an appeal under *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969).  Griffith's appellate counsel searched the record on appeal, found no arguable nonfrivolous question of law, and asks us to review the record for fundamental error.  *See Anders*, 386 U.S. 738; *Smith v. Robbins*, 528 U.S. 259 (2000); *State v. Clark*, 196 Ariz. 530 (App. 1999).  Griffith was given an opportunity to file a supplemental brief *in propria persona* but did not do so.

**¶3**        We find no fundamental error, and therefore affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶4**        Griffith was indicted for second-degree murder of E.A., and for abandonment or concealment of his dead body.  The indictment included citations to the statutes governing accomplice liability.  Griffith was found competent to stand trial in proceedings under Ariz. R. Crim. P. 11, and the matter proceeded to a jury trial.

**¶5**        At trial, the state presented evidence of the following facts.  From approximately 2001 to 2003, E.A. and his wife lived in the same neighborhood as Griffith and her husband, Daniel Griffith ("Daniel").  During that time, E.A. was a frequent visitor at the Griffiths' residence, which they shared with Griffith's parents.  E.A. continued to maintain contact with Daniel after moving away from the neighborhood.

**¶6**        From the evening of February 6 through the morning of February 7, 2012, multiple calls were exchanged between the Griffiths' home phone and E.A.'s cell phone.  E.A. failed to return home after work on February 7, and did not answer his family members' repeated calls.  That afternoon, E.A.'s wife, N.Y., inspected his cell phone records and discovered the calls to and from the Griffiths' number.  N.Y. called the Griffiths and spoke to Griffith.  When N.Y.

inquired about E.A.'s whereabouts, Griffith stated that E.A. had called in search of an acquaintance's phone number and that she did not know his location. Daniel then spoke to N.Y. and gave a similar response. Both Griffith and Daniel gave N.Y. a phone number that they claimed to have passed on to E.A. N.Y. called that number and found it was not in service.

¶7        That evening, N.Y. confronted the Griffiths at the front door of their residence. Griffith, who appeared nervous, repeated the phone number that she had previously given to N.Y. Daniel then told N.Y. that E.A. had last visited in November 2011. He also stated that he would kill E.A. if he saw him, because he had learned of a previous sexual relationship between E.A. and his wife. Griffith was present when Daniel made these remarks, and she said nothing.

¶8        N.Y. declined Daniel's repeated invitations to enter the residence, and she returned to her home. She and other family members continued to try to contact E.A. by phone, but they received no answer. By the next morning, February 8, N.Y.'s calls to E.A.'s cell phone were going straight to voicemail. She again drove to the Griffiths' residence. On the way, she contacted E.A.'s financial institutions and learned that someone had attempted to use E.A.'s bank card to withdraw funds from automatic teller machines at convenience stores near the Griffiths' residence.

¶9        When N.Y. arrived at the Griffiths' residence, she saw Griffith drive up in a pickup truck. N.Y. approached Griffith in the driveway, accused her of knowing E.A.'s location and of attempting to use his bank card, and informed her that she was going to contact law enforcement. Griffith, visibly shaking, told N.Y. that she did not want to be blamed for something that she did not do. N.Y. left and filed a missing persons report with the police.

¶10       The police contacted E.A.'s cell phone service provider and learned that his phone's last known location was in the area of the Griffiths' residence. They also learned, from surveillance video and an eyewitness, that Daniel was the person who had attempted to use E.A.'s bank card. Based on this information, the police obtained a warrant to search the Griffiths' residence.

¶11       Before executing the warrant, the police found E.A.'s car parked behind apartments near the Griffiths' residence. A resident informed police that the car had been parked there for several days. Police opened the car using a key fob provided by E.A.'s family. They found finger-shaped bloodstains on the trunk latch, and found a dry red clot inside of the empty trunk. Testing later revealed that the blood was E.A.'s.

¶12       The police executed the search warrant on the evening of February 9. Wearing marked police vests, they approached the front door of the

Griffiths' residence and found that the front door was open but the security door was closed. The police announced their presence and ordered that the door be opened, but the inhabitants did not comply. The police therefore breached the door and detained various individuals, including Griffith, who was standing just inside the entryway. Griffith was forced to the floor and handcuffed.

**¶13** A detective escorted Griffith to a marked patrol vehicle and questioned her about E.A.'s whereabouts. At that point, the detective knew that E.A.'s car had been found, and he believed that E.A. was alive and possibly in danger. Griffith initially denied any knowledge of E.A.'s location, but then disclosed that she and Daniel had burned his body in the desert. The detective stopped the conversation and moved Griffith to a different vehicle, where she was advised of her *Miranda*[1] rights and interviewed by him and two other detectives. Though the audio-recording of the interview reveals that Griffith did not verbally indicate that she understood her rights and wished to waive them, one of the interviewing detectives testified at trial that she "kind of nodded her head as she understood."

**¶14** Griffith told the detectives several different versions of events. First, she claimed that E.A. had been stalking and harassing her, that her only recent contact with E.A. had been by phone, that the contact had angered Daniel, and that he had told her she would not have a stalker anymore. She stated that Daniel later asked her to help him pack the bed of a pickup truck with various trash items, including a large and oddly shaped item wrapped in a blanket, and that he had driven them to the desert.

**¶15** Griffith then modified her story, claiming that E.A. had bullied her into inviting him to the house and that he had attempted to rape her in the garage. Griffith stated that Daniel responded to her screams, shot E.A. with his rifle, directed her to leave, and later requested that she help him move a large blanket-wrapped item from the garage into the bed of the pickup truck. Griffith stated that the middle of the object was shaped like a bent elbow or knee, and that she rode with Daniel to the desert, where she helped him unload the item and he set fire to it.

**¶16** Griffith then modified her story once more, varying her description of E.A.'s conduct and comments in the garage. Among other things, she stated that E.A. had threatened her with a box cutter. She also disclosed that Daniel had been hiding in the garage with the gun because he wanted to talk to E.A.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶17 Griffith agreed to guide the police to the burn site. Aided by Griffith, the police found a badly burned body deep in the desert. The medical examiner who autopsied the body concluded that the cause of death was multiple gunshot wounds. He concluded that the body had sustained at least three gunshot wounds -- to the head, to the neck, and to the pleural cavity. He also found that parts of the facial bones were missing or damaged. Dental records showed that the body was E.A.'s.

¶18 A search of the Griffiths' residence revealed several items of evidence in their shared bedroom, including a piece of paper with E.A.'s name and an address, a printout of MapQuest directions to the address, a handwritten letter from Griffith to Daniel in which she professed her love for him and apologized for having been unfaithful, and a pair of men's pants stained with blood. The police also found an operable .22 caliber rifle with a loaded magazine, an operable .22 caliber pistol with a round of ammunition in the chamber, and multiple loose rounds of .22 caliber ammunition. Testing later revealed blood on the muzzle of the rifle. Experts could not exclude E.A. as the source of the blood or the firearms as the source of the bullets recovered from his body.

¶19 The police also found evidence in the Griffiths' garage, a cluttered space with a walkway leading to a door into the house. They found a key fob for E.A.'s vehicle and a small address book containing E.A.'s personal items. They also found blood on multiple surfaces in the garage -- there were transfer stains on several of the items in the garage, and there were high- and medium-velocity spatter stains on the inside of the garage door and the garage floor. In at least one detective's opinion, it appeared that someone had tried to clean up the blood: he found an almost-empty bottle of bleach by the interior door. Tests showed that some of the blood was E.A.'s.

¶20 E.A.'s blood was also found in Griffith's parents' pickup truck, which the police found parked at the Griffiths' residence. In the bed of the truck, police found a fabric tie-down strap stained with E.A.'s blood. They also found a gas can and a bloodstained rag. In the cab of the truck, they found a pair of white sunglasses that matched the sunglasses worn by Daniel in surveillance video from one of the convenience stores. The video showed, however, that Daniel had used a vehicle other than the pickup truck to visit at least one of the stores. The police searched this vehicle, which was also found parked at the Griffiths' residence, but they did not find anything of evidentiary value. Nor did they find anything in a third vehicle found at the residence.

¶21 A detective interrogated Griffith at the police station. She was again advised of her *Miranda* rights, and again nodded her head to indicate that she understood her rights. She eventually admitted that she had lured E.A. to

the house by suggesting that she would have sex with him. She also admitted that she knew Daniel was planning to confront E.A. and point a gun at him.

¶22 Griffith testified to yet another version of events. She testified that Daniel was very controlling and paranoid, and had long suspected her of past unfaithfulness. Around November 2011, he learned that she had cheated on him with E.A. during the time they were neighbors. He became very angry, and orchestrated a meeting between himself, Griffith, and E.A. But even after the meeting, Daniel continued to question Griffith about the affair, and he returned home one day with injuries caused by E.A. Later, on February 7, Daniel forced Griffith to invite E.A. to their residence, telling her that he wanted to talk to E.A. He instructed her to lead E.A. into the garage when he arrived, and she did so, not knowing that Daniel was there. When her back was turned, Daniel shot E.A. multiple times with his pistol; he then hit E.A. with the gun. Griffith left the garage. When she left the house with her mother a short time later, she did not see E.A.'s car parked outside. That afternoon, Daniel called her and instructed her to pick him up from a friend's apartment. She did so, and he directed her to drive him to a convenience store. Late that night, Daniel woke her. At his direction, she helped him load a heavy blanket-wrapped object into the bed of the pickup truck. She then rode with him as he drove deep into the desert, where she stayed in the truck as he unloaded the bed and set the contents on fire. She learned on the drive back that the burned items included E.A.'s body.

¶23 The state impeached Griffith with her recorded interviews. Griffith testified that she had lied to the police because she had been frightened, because she had been under the influence of medication, and because she had been subconsciously defending her husband.

¶24 After considering the evidence and closing arguments, the jury found Griffith guilty of second-degree murder, and of abandonment or concealment of a dead body. The jury found that the murder was a dangerous offense, and found several aggravating factors with respect to each of the offenses. The jury found that both offenses involved the presence of an accomplice and caused harm to the victim's immediate family, and found that the murder also involved the use of a deadly weapon. The court entered judgment on the jury's verdicts and sentenced Griffith to a flat eighteen-year prison term for the murder and a concurrent two-year term for the abandonment or concealment of a dead body, with credit for 805 days of presentence incarceration. Griffith appeals.

## DISCUSSION

¶25 We find no fundamental error. Griffith was present and represented by counsel at all critical stages. The jury was properly composed of

eight jurors in accordance with A.R.S. § 21-102(B) and Ariz. R. Crim. P. 18.1(a), and there is no evidence of jury misconduct or bias. Though the record reveals that two of the jurors experienced an interpersonal conflict, both they and a third juror who was aware of the issue informed the court that the conflict had not affected the jury's deliberations.

**¶26** The evidence presented at trial was properly admissible. We note that Griffith did not move to suppress any of her statements to law enforcement, but objected at trial to the state's introduction of the pre-*Miranda* statements. The court overruled the objection based on the "rescue doctrine" (also known as the "private safety exception") adopted in *State v. Londo*, 215 Ariz. 72 (App. 2006). Relying on the three-part test announced in *People v. Riddle*, 83 Cal. App. 3d 563 (Cal. App. 1978), *Londo* held that the rescue doctrine excepts statements from *Miranda* when there is "1) an urgent need, and no other course of action promises relief; 2) the possibility of saving a human life by rescuing a person in danger; and 3) rescue is the primary purpose and motive of the interrogator." *Londo*, 215 Ariz. at 76, ¶ 10. The California Supreme Court later eliminated the third prong of the *Riddle* test, relying on United States Supreme Court cases to hold that "applicability of the rescue doctrine must be grounded on objective facts known to law enforcement." *People v. Davis*, 208 P.3d 78, 122 (Cal. 2009).

**¶27** At the time Griffith was taken into custody, the police knew that E.A. had gone missing a few days before. They also knew that he had exchanged multiple calls with someone at the Griffiths' residence before he went missing, and that his last known location was near the Griffiths' residence. They had evidence that E.A.'s cell phone was turned off or inoperable and that Griffith's husband had attempted to use E.A.'s bank card. They had also found E.A.'s car parked near the Griffiths' residence. Based on these facts, we cannot say that the court erred by concluding that the pre-*Miranda* interview, a brief encounter that was limited to questions regarding E.A.'s whereabouts, was reasonably necessary and reasonably designed to locate a kidnapped victim who could still be alive. Further, to the extent that the interrogating detective's subjective state of mind was relevant, the detective testified that he believed E.A. might have been kidnapped and was possibly alive.

**¶28** The evidence was sufficient to support the jury's verdicts. A person commits second-degree murder when, "without premeditation[, he or she] . . . intentionally causes the death of another person . . . or[, k]nowing that [his or her] conduct will cause death or serious physical injury, . . . causes the death of another person . . . or[, u]nder circumstances manifesting extreme indifference to human life, [he or she] recklessly engages in conduct that creates a grave risk of death and thereby causes the death of another person." A.R.S. § 13-1104(A). A person commits abandonment or concealment of a dead body when he or she "knowingly move[s] a dead human body or parts of a human body

with the intent to abandon or conceal the dead human body or parts."   A.R.S. § 13-2926(A).  A person may be liable for either of these offenses as an accomplice if he or she aids another in planning or committing the offense or provides the means and opportunity for the other person to commit the offense.  A.R.S. §§ 13-301(2)-(3), -302, -303.

¶29        The state presented evidence that Griffith, at a minimum, lured E.A. to her garage knowing that her armed husband, who had a conflict with E.A., was waiting within.  The state also presented evidence that E.A. was killed in the garage, and that Griffith thereafter helped her husband dispose of the body by burning it deep in the desert.  At the very least, the evidence was sufficient to support Griffith's convictions under an accomplice theory.  The evidence was also sufficient to support the jury's finding that the murder was a dangerous offense.  An offense is dangerous if it involves "the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury on another person." A.R.S. § 13-105(13).  A firearm is a deadly weapon.  A.R.S. § 13-105(15).  The state presented evidence that E.A. died of multiple gunshot wounds.

¶30        The evidence was also sufficient to support the jury's aggravating-circumstances findings.  The finding that the offenses involved the presence of an accomplice was supported by copious evidence regarding Daniel's participation.  The finding that the offenses caused harm to E.A.'s immediate family was supported by N.Y.'s testimony that she, E.A.'s mother, and E.A.'s children were seriously traumatized by his murder and the state in which his body was recovered.  Finally, the finding that the murder involved the use of a deadly weapon was supported by the evidence that E.A. died of gunshot wounds.

¶31        Griffith received lawful sentences for her convictions.  *See* A.R.S. §§ 13-1104(C), -706(A), -710(A), (C), -701(D), -2926(C), -702.  She was given an opportunity to speak at the sentencing hearing, and the court stated on the record the evidence it considered and the factors it found in imposing sentence.  Consistent with A.R.S. § 13-712(B), the court properly calculated and applied her presentence incarceration to her sentences.

## CONCLUSION

¶32        We have reviewed the record for fundamental error and find none. *See Leon*, 104 Ariz. at 300.  Accordingly, we affirm Griffith's convictions and sentences.

¶33        Defense counsel's obligations pertaining to this appeal have come to an end. *See State v. Shattuck*, 140 Ariz. 582, 584-85 (1984).  Unless, upon review, counsel discovers an issue appropriate for petition for review to the Arizona

Supreme Court, counsel must only inform Griffith of the status of this appeal and her future options. *Id.* Griffith has 30 days from the date of this decision to file a petition for review *in propria persona. See* Ariz. R. Crim. P. 31.19(a). Upon the court's own motion, Griffith has 30 days from the date of this decision in which to file a motion for reconsideration.

